JOHN BENTLEY, Defendant in Error, *vs.* WILLIAM J. ROSS, Plaintiff in Error.

*Opinion filed April 19, 1911—Rehearing denied June 7, 1911.*

1. CONTRACTS—*in reducing an oral contract to writing parties may elect to make changes.* Where a tunnel contractor and his superintendent reduce to writing an oral contract whereby the superintendent was to have one-third of the profits of the tunnel work, it is competent for them to elect to treat the amount to be recovered in a pending suit by the contractor, less the expense of such suit, as the amount in which the one-third interest exists, and in a subsequent suit the writing may be reformed so as to show the true docket number of the case referred to therein without reforming the writing so as to make it embody the original oral contract.

2. SAME—*when rights of parties are not fixed by an oral contract.* Where an oral contract between a contractor and his superintendent for one-third of the profits made on a tunnel contract is changed by the parties when reducing their agreement to writing, so as to apply to one-third of the amount to be recovered by the contractor in a pending suit against the city, the superintendent, in order to recover under the writing, need not prove that the tunnel contract was completed at a profit, nor is evidence admissible on the part of the contractor to show the contrary.

3. MASTERS IN CHANCERY—*what should be shown in master's claim for fees.* The claim of a master in chancery for fees should show the time he was necessarily employed in the examination of questions of law and fact and in preparing his report, and if objection is made by the party liable for such fees the master should be required by the court to support his claim by proof.

4. SAME—*when objection that master's fees were not itemized is not waived.* Where the master, having required pre-payment to him of fees before he would file his report, makes no formal claim for fees, the fact that the solicitor for the party liable makes an informal complaint to the court that the fees charged are unreasonable is not a waiver of the right to urge in a court of review that the fees were not itemized, as required by law.

5. SAME—*when specific objection to master's fees is not necessary.* If a party to a chancery suit objects to each provision of the decree that is adverse to his interests, it is not necessary that he make a specific objection to the master's charges for fees in order to raise the question in a court of review.

6. SAME—*in the absence of claim for fees court can only allow statutory fees.* In the absence of any claim by the master for an

allowance of fees it is error for the court to allow anything but the statutory fees to which he is entitled.

7. The court reviews the evidence in this case, and holds that it sustains the decree finding that there was an oral contract between the parties; that it was subsequently reduced to the form of a written assignment; that there was a mutual mistake in such assignment which was properly subject to correction; that the release produced by the defendant was a forgery, and that the complainant was entitled to recover on the assignment.

WRIT OF ERROR to the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. M. W. PINCKNEY, Judge, presiding.

DAVID K. TONE, for plaintiff in error.

MANN & MILLER, for defendant in error.

Mr. JUSTICE COOKE delivered the opinion of the court:

This suit was originally begun in the circuit court of Cook county by the filing of a bill for an injunction by John Bentley, the defendant in error, against the city of Chicago and certain of its officers, and William J. Ross and J. J. Ross, as partners, doing business under the firm name of Ross & Ross, to restrain the city and its said officers from paying, and Ross & Ross from collecting or receiving, any money in settlement of a certain suit then pending in said circuit court wherein William J. Ross and J. J. Ross, partners as aforesaid, were plaintiffs and the city of Chicago was defendant. A temporary injunction was issued in accordance with the prayer of the bill, and thereafter the bill was amended so as to include a prayer for an accounting and for a decree requiring the city of Chicago to pay to Bentley the amount found to be due him upon such accounting. Subsequently an amended and supplemental bill was filed, which substantially sets forth the facts claimed by Bentley to have been established upon the hearing of

the cause. This amended and supplemental bill alleged that
in May, 1897, the firm of Ross & Ross, being then engaged
in the construction of a certain water tunnel under a con-
tract with the city of Chicago, employed Bentley as super-
intendent of the work and agreed to pay him for his ser-
vices a monthly salary of $150, and to give him, in addition
thereto, one-third of the net profits derived from the con-
struction of the water tunnel under the contract with the
city; that Bentley continued as such superintendent under
that agreement until some time in January, 1898, when the
city declared a forfeiture of the contract and took pos-
session of the water tunnel; that thereafter Ross & Ross
brought an action of assumpsit in the circuit court of Cook
county against the city to recover the amount claimed to
be due them under the contract for work, labor and ser-
vices rendered and materials furnished in the construction
of the water tunnel, which suit was placed on the court
docket as No. 180,302; that when the original bill was
filed herein a verdict had been rendered in that suit against
the city and in favor of Ross & Ross for $35,000 and a
motion for a new trial was pending, but the parties to the
suit had then agreed upon a settlement thereof; that after-
wards, in accordance with the terms of such settlement, the
motion for a new trial was withdrawn and judgment was
rendered upon the verdict against the city and in favor of
Ross & Ross for $35,000; that under the terms of his em-
ployment as superintendent Bentley had a one-third inter-
est in the claim which was the subject matter of the suit
docketed as No. 180,302, but that the agreement under
which his interest was acquired had not, up to November
11, 1901, been reduced to writing; that during the fore-
part of November, 1901, and while the trial of said cause
was in progress, Bentley became dissatisfied because the
evidence of his interest in said claim and suit rested only
in parol, and requested Ross & Ross to assign or transfer
to him, in writing, his interest in the claim involved in the

suit then on trial, and that thereupon Ross & Ross executed and delivered to him the following written assignment:

"This memorandum of agreement, made this 11th day of November, A. D. 1901, between William J. Ross and J. J. Ross, composing the firm of Ross & Ross, contractors, of the city of Chicago, Cook county, Illinois, and John Bentley of the same place, witnesseth:

"Whereas, said Ross & Ross are the owners and holders of a claim against the city of Chicago for damages under a contract between said Ross & Ross and said city for the construction of the Sixty-eighth street water tunnel, which said claim now in suit pending in the circuit court of Cook county, wherein said Ross & Ross are plaintiffs and the said city of Chicago is defendant, being case General No. 180,301.

"Now, therefore, the said Ross & Ross, for and in consideration of the sum of one dollar and other good and valuable consideration by them, the said Ross & Ross, received of and from the said Bentley, have assigned, transferred and set over, and do hereby assign, transfer and set over, to said Bentley one-third of their said claim in said suit and one-third of any final judgment which may be entered in their favor in said suit and one-third of any settlement or compromise of said claim, meaning and intending hereby that after payment of 'all court costs, attorney's and stenographer's fees and expert witness' fees, also printing of briefs and other necessary expenses and obligations, deducting the same from the amount of the final judgment in said suit or settlement thereof, one-third of the balance remaining shall belong to and be the property of said Bentley, and he may receive and recover the same by suit or otherwise.

"Witness the hands and seals of the parties the day and year first above written.                    Ross & Ross,
                                        By W. J. Ross.

"Subscribed and sworn to before me this 21st day of November, 1901.
(Seal)          ELLSWORTH J. WALTON, *Notary Public.*"

The bill further alleged that when this assignment was made there was also pending in said circuit court a suit in trover, the docket number of which was 180,301, wherein Ross & Ross sought to recover from the city the value of certain machinery, tools and materials which it was claimed the city had converted to its use when it took possession of the water tunnel, and in which a judgment for $5000 against the city was thereafter rendered by agree-

ment of the parties; that Bentley had no interest in this claim or suit; that the scrivener by whom the above assignment was drawn, through inadvertence or mistake, inserted in said instrument the number of the trover suit against the city, whereas it was intended by the parties to the assignment that it should relate to the suit in assumpsit; that Ross & Ross are insolvent and financially irresponsible; that they have refused to give Bentley an order on the city comptroller for the amount due him under said assignment and now fraudulently pretend that Bentley has no interest in the judgment for $35,000, but that his interest, if any, under the said assignment is in the judgment for $5000 which was rendered in the trover suit. The prayer of the amended and supplemental bill is, that the said error or mistake in the assignment be corrected and the instrument reformed so as to truly describe the suit intended by the parties to be therein described; that an accounting be had of the amount due Bentley under the assignment as reformed and corrected; that the city of Chicago be ordered and directed to pay Bentley the amount found due him upon such accounting, and for general relief.

Upon the hearing before the master it developed that J. J. Ross, who was formerly a member of the firm of Ross & Ross, had been dead for a number of years, but that William J. Ross, the surviving partner, had continued to transact business under the firm name, and that the contracts and suits between the city of Chicago and Ross & Ross were really contracts and suits between the city and William J. Ross. The contention of William J. Ross, as disclosed by his answer, by the evidence produced before the master and by his brief and argument in this court, is, that he never promised or agreed to give Bentley one-third of the net profits derived from the tunnel contract; that the assignment above set out was obtained from him without any consideration and solely by means of a threat made by one John McKechney that unless such assignment was

executed Bentley would testify for the city and against
Ross in the assumpsit suit which was then on trial in the
circuit court; that it was understood by McKechney, who
obtained the assignment for Bentley, and by Ross, that the
assignment was null and void because of the illegal con-
sideration therefor and could not be enforced, and that it
was agreed between them that McKechney should retain
possession of the assignment and should never part with
its possession; that it was also distinctly understood be-
tween McKechney and Ross when the latter executed the
assignment, that it referred to the trover suit and not to
the suit in assumpsit; that no net profits had been derived
from the construction of the water tunnel, but that the
work thereon under the contract with the city had been
carried on at a heavy loss.    Defendant Ross also claimed
that on November 27, 1901, Bentley, in consideration of
the execution and delivery to him of a promissory note for
$300 by William J. Ross, released and discharged Ross &
Ross from all liability on account of the said assignment.
Bentley denied that he executed this release and claimed
that the signature thereto was a forgery.

The master to whom the cause was referred to take the
evidence and report the same, together with his conclusions
upon the law and facts, filed his report, in which, after an
elaborate discussion of the evidence, all the material issues
of fact were found in favor of the complainant, Bentley.
The master also found that the net amount of the judg-
ment in the assumpsit suit, after paying all expenses in-
curred therein by Ross, was $16,490.33, of which Bent-
ley was, under his assignment, entitled to $5496.77, and
recommended that a decree be entered in accordance with
his findings and conclusions and with the prayer of the
amended and supplemental bill.    Upon this report the court
entered a decree finding the facts as reported by the mas-
ter, reforming and correcting the assignment by changing
the figures 180,301 therein to 180,302, allowing $1016.50

to the master for his services, and providing that $550 thereof, which had been paid to the master by Bentley, be taxed as costs and re-paid to Bentley out of the moneys in the possession of the city of Chicago, and ordering the city of Chicago, in addition to the sums so taxed as costs, to pay to Bentley, out of the moneys in its possession, the sum of $5496.77 due him under the assignment of November 11, 1901. William J. Ross prosecuted an appeal to the Appellate Court for the First District, where the decree of the circuit court was affirmed. The cause has been brought to this court by writ of *certiorari* granted upon the petition of William J. Ross.

It is first insisted on behalf of the plaintiff in error that the great weight of the evidence shows that plaintiff in error never promised to give defendant in error one-third of the net profits of the tunnel contract, but that the assignment to Bentley was executed without any lawful consideration. At the hearing before the master a large number of witnesses were examined and a great mass of testimony taken, consisting, when transcribed, of 1274 typewritten pages. The testimony on behalf of the respective parties was sharply conflicting and contradictory. To arrive at a correct determination of the questions involved it is necessary to determine in whose favor the evidence preponderates on four or five different questions. It would be impossible within the scope of this opinion to discuss and analyze all the testimony bearing upon these various questions, and we will not attempt to do that. The master found with the defendant in error on every material issue in the case. The findings of the master were adopted by the chancellor upon the hearing of exceptions to the report of the master and a decree was entered in accordance with those findings. This decree has been affirmed by the judgment of the Appellate Court. We have made a painstaking examination of the whole record and are of the opinion

that a clear preponderance of the evidence supports the findings of the master in every particular.

As to whether the contract of May, 1897, which the defendant in error contends was made between himself and William J. Ross, was entered into as claimed depends largely upon the testimony of the defendant in error and Ross, although other testimony was introduced by both parties as bearing upon the question. The master made two reports. By the first report, filed in October, 1904, he did not specifically find whether this oral contract had been made between the parties, consequently the matter was re-referred, with directions to "clearly find, from a considera-tion of all the evidence heretofore introduced before said master, that such an agreement between said Bentley and Ross was or was not made." The master thereupon filed a supplemental report, in which he found that in the month of May, 1897, the plaintiff in error agreed with the defend-ant in error that if the latter would continue to act as superintendent of the tunnel work he would give him $150 a month and one-third of the net profits of the tunnel con-tract, and also reported that after a full consideration of all the evidence he was convinced that defendant in error's testimony was more reliable than that of plaintiff in error and that the evidence in his behalf was more credible than that offered on behalf of the plaintiff in error. This con-clusion is amply supported by the evidence.

The facts proven so thoroughly discredit the testimony of plaintiff in error that we feel warranted in disregarding it altogether, except where it is corroborated by other cred-ible evidence. The facts which tend to discredit his testi-mony are many, but it will only be necessary to refer to two circumstances to show the character of it.

During the progress of the trial of the assumpsit suit against the city, according to the testimony of defendant in error, he reminded plaintiff in error that their contract made in May, 1897, had never been reduced to writing and

requested that the same be done, as the defendant in error was about to leave Chicago for the State of California on account of the failing health of some member of his family. Plaintiff in error agreed that the contract should be reduced to writing and requested McKechney to draw up an assignment to defendant in error of one-third interest in the assumpsit suit, giving to McKechney the substance of what the assignment was to contain. Plaintiff in error was a member of the Order of Elks, and when McKechney informed him that he had the assignment prepared, plaintiff in error took him to a clubroom of the Elks lodge, where he inspected the assignment which McKechney had drawn. He was not satisfied with its terms, and, taking a sheet of the Elks stationery, he made a pencil memorandum of what he thought the assignment should contain. After reading the memorandum thus made by plaintiff in error, McKechney pointed out to him that it was substantially and in effect the same as the assignment which McKechney had prepared. After having McKechney interline one word in his draft of the assignment plaintiff in error agreed that they were substantially the same and executed the assignment drawn by McKechney, thus interlined. McKechney, by agreement of the parties, was to hold the original assignment until the suit had been finally determined. Upon leaving the Elks clubroom on this occasion, McKechney took with him, together with the assignment, this pencil memorandum which had been made by the plaintiff in error. Upon the hearing of this cause this pencil memorandum was produced by the defendant in error, and upon its presentation to plaintiff in error while on the witness stand he denied that he had ever seen it before or that it was in his handwriting. As the consideration for the giving of this assignment was one of the questions in dispute, the authenticity of this pencil memorandum became highly important. The proof shows conclusively that this memorandum is in the handwriting of the plaintiff in error, Ross,

and that it was drawn under the circumstances detailed by McKechney. A number of witnesses were produced by the defendant in error who were familiar with the handwriting of Ross, and they all testified that it was in his handwriting. Handwriting experts were called to the stand, who testified that from a comparison of the samples of the conceded handwriting of Ross this pencil memorandum was written by him. On the other hand, plaintiff in error produced witnesses who testified that they were acquainted with his handwriting and that this memorandum was not written by him, but these witnesses also testified, when samples of the conceded handwriting of Ross were presented to them, that those were not in his handwriting. The non-expert witnesses for defendant in error, on the other hand, recognized each specimen of handwriting conceded to be that of plaintiff in error unhesitatingly, and just as unhesitatingly declared every specimen which was not in the handwriting of Ross not to be his handwriting. Plaintiff in error also produced a handwriting expert who not only pronounced the memorandum not to be in the handwriting of plaintiff in error, but just as readily declared that certain conceded specimens of his handwriting were not written by him. The conclusion is inevitable that the plaintiff in error deliberately denied his own handwriting in order to escape the consequences of the effect of admitting that McKechney had drawn the assignment according to the instructions given him by the plaintiff in error.

Another instance of where the testimony of the plaintiff in error was wholly discredited on a material matter was in reference to the release which he claimed had been executed by defendant in error on the evening of the day the verdict was returned by the jury in the assumpsit suit. The assignment to the defendant in error of a one-third interest in that suit was dated November 11, 1901, and was executed about that time. The verdict was returned on November 27, 1901. On the hearing before the master the

plaintiff in error produced and offered in evidence a pre-
tended release which he claimed had been executed by the
defendant in error, and which was as follows:

"CHICAGO, *November 27th, 1902.*

"In consideration of Ross & Ross giving me a promissory note
for three hundred dollars at three months, the same being a can-
cellation of all claims of every kind which I may have against
Ross & Ross, the said promissory note being dated 27th of No-
vember, 1902.                              JNO. BENTLEY.
Witnesses: W. J. Ross, Kenneth Ross."

The evidence shows that this release was dated Novem-
ber 27, 1902, but that at the time of the hearing the last
figure "2" in the date line had become so obliterated by
reason of a fold in the paper crossing that figure that it
was impossible, without the aid of a magnifying glass, to
determine whether it was a figure 1 or 2. In the body of
the instrument, however, in describing the promissory note
which is alleged to have been executed simultaneously with
this release, the date is plainly 1902. The plaintiff in error
and Kenneth Ross, his brother, who signed the release as a
witness, both testified that they met Bentley at a saloon at
the corner of Clark and Washington streets, in the city of
Chicago, between 4:30 and 5 o'clock on the afternoon of
November 27, 1901, and that shortly thereafter the three
men went to the saloon of Al Kuhns, at 273 Dearborn
street, where Bentley executed the release about six o'clock.
Welbasky, a saloon-keeper, and Hicks, a bar-tender, testified
that they also witnessed the execution of this release, all
of the witnesses except Hicks testifying that Bentley was
present and executed it. Hicks, at the time of the hear-
ing, was not able to positively identify the defendant in
error as the man who was there with plaintiff in error and
his brother, Kenneth Ross. These witnesses testified that
the release was drawn by plaintiff in error upon the pol-
ished surface of the saloon bar and was signed by the de-
fendant in error and the two witnesses upon the bar. Upon
cross-examination plaintiff in error, when asked specifically

as to how the release was signed by Kenneth Ross, testified that he believed that instead of signing it upon the bar Kenneth Ross placed the paper upon the rough glass partition between the bar and the cigar counter in the room, and thus signed it. A very cursory inspection of this paper discloses that the signature of Kenneth Ross was signed while the paper was lying upon some rough surface. The handwriting experts, who were later called, testified that it appeared to have been written upon some such surface as the cloth covering of a book. It was apparent that it was not upon such a surface as a polished bar would present. Kuhns was called later by the defendant in error and testified that the glass partition between the saloon bar and the cigar-stand in his saloon was composed of polished French mirror, and that there was no rough glass anywhere in his saloon except a panel in the front door. Handwriting experts testified that the pretended signature of defendant in error to this paper was not in his handwriting. Defendant in error himself testified that on the afternoon of November 27, 1901, he was working for the city, engaged in laying brick in a sewer between Thirty-ninth and Fifty-first streets, in the city of Chicago; that he worked overtime that day and quit work at about half-past five o'clock. The time-keeper for the city on this sewer work testified that he kept the time of Bentley on that day, and that he commenced work at eight o'clock in the morning on November 27, 1901, and quit work at 5:30 P. M. Two of defendant in error's fellow-workmen testified to the same facts, and testified further that they went home with defendant in error on the Illinois Central railway; that they boarded the train shortly before six o'clock, rode to Randolph street, where they alighted, and accompanied the defendant in error to his hotel, at the corner of Michigan and Wells streets, where they arrived at about a quarter past six o'clock. Effort was made on the part of defendant in error to secure the presence of the witness

Hicks after he had testified for plaintiff in error, but although subpœna was served upon him he did not respond but instead absconded from the city of Chicago. The master and the chancellor both found that this release was a forgery, and this finding is supported by a clear preponderance of the evidence.

Other facts shown might be cited which tend to discredit the testimony of the plaintiff in error, but we deem it unnecessary to refer but to these two, which concern very material features of the case.

Plaintiff in error insists that defendant in error is discredited by reason of the fact that his testimony in this cause differs from that given by him on the trial of the assumpsit suit of Ross & Ross against the city of Chicago, in which he was a witness. On the trial of the assumpsit suit defendant in error, who was called as a witness by the plaintiffs in that suit, was not asked, on his cross-examination, whether he had any interest in the event of the suit, although it is evident that he created the impression, without testifying directly to that fact, that he did not have an interest in the event of that suit. Upon his cross-examination he testified, as the records of that trial proven here disclose, that he was receiving from the plaintiff in error, as superintendent at the crib, a flat monthly salary, his board, and extra pay for all brick he should lay. He testified before the master in this cause that at that time he was receiving a flat monthly salary and his board, and nothing more. Defendant in error did not attempt to explain this discrepancy during his examination. This difference in the testimony of the defendant in error given in the assumpsit suit and given on the hearing of this cause is not sufficient to entirely discredit him, nor, assuming that the testimony on the trial in the assumpsit suit disclosed the true terms upon which defendant in error accepted the superintendency at the crib, is it sufficient to show that it is improbable that the contract was made which defendant

in error claimed was entered into in the latter part of May, 1897, and within a month after he had been employed as superintendent.

Plaintiff in error also insists that there is such a discrepancy between the allegations of the original bill herein, which was sworn to by the defendant in error, and the amended and supplemental bill, as to discredit defendant in error and to disclose that the alleged contract of May, 1897, was an afterthought. We cannot give our assent to this proposition. The bill was originally filed for the sole purpose of enjoining the payment of the full amount of the judgment to plaintiff in error. The allegations relied upon by plaintiff in error as showing a fatal discrepancy between that and the supplemental bill were, in substance, that prior to November 11, 1901, (the date of the execution of the assignment,) defendant in error had performed certain work, rendered certain services and laid out and expended for and on account of Ross & Ross a large sum of money, which said work, services and expenditures of money were all performed and laid out by him in and about the business and at the request of Ross & Ross. It is upon the fact that this bill was sworn to and that it did not contain any reference to the alleged contract of May, 1897, but instead contained the allegations just referred to, that plaintiff in error relies in his contention that the defendant in error's testimony about the alleged agreement for one-third of the net profits of the tunnel contract was an afterthought, invented by him after he had filed his original bill. When it is borne in mind that the bill was one for injunction, only, and not for the reformation of the assignment, the allegations of the original bill will not bear the interpretation placed upon them by the plaintiff in error or warrant the deductions made. Those allegations, while not as specific as they might have been, are such as might have been drafted by any careful lawyer acquainted with all the

facts, and they stated the facts with sufficient accuracy to warrant its being sworn to by the complainant.

Plaintiff in error does not deny the execution of the assignment which is sought to be corrected by this bill. He does claim, however, that he executed the assignment, not of his own free will, but as the result of threats made to him by McKechney that unless he did execute this assignment defendant in error would go over to the city and testify against him. At the time plaintiff in error claimed these threats were made defendant in error had already testified in his behalf and had been on the stand for the greater part of three days. The case was almost finished at the time of the execution of the assignment and the city had virtually closed its defense. Defendant in error testified that he requested plaintiff in error to reduce to writing their oral agreement made in May, 1897, and that he agreed to do so. McKechney testified to the same effect, and their testimony is, that thereupon the plaintiff in error requested McKechney to draft an assignment for him and gave him the substance of the matter to be contained in the assignment. A preponderance of the evidence shows that the assignment was executed for the purpose of reducing the prior oral agreement to writing, and not for the purpose of preventing Bentley from testifying on behalf of the city and against Ross & Ross.

Plaintiff in error contends, however, that if this assignment should be reformed, inasmuch as it was made to reduce to writing the prior oral agreement, it should be reformed so as to express that oral agreement and give defendant in error an interest in one-third of the net profits of the tunnel contract instead of an assignment of a one-third interest in the judgment obtained in the assumpsit suit. While it is true that as this assignment is drawn it does not state the prior oral agreement in the terms of that agreement and to that extent is not a reduction of that agreement to writing, it is apparent from all the circum-

stances surrounding this transaction that the parties elected to treat, and did treat, the amount involved in the assumpsit suit of Ross & Ross against the city as representing the net profits of the tunnel contract, or, at least, that they elected to substitute for the net profits of the tunnel contract whatever amount should be secured from the city as a result of that suit. That this is true is evidenced by the fact that the plaintiff in error himself stated to McKechney the matter which was to be contained in the assignment, and defendant in error accepted the assignment as satisfactory upon its execution. The existence of the pencil memorandum above referred to, drawn by plaintiff in error at the Elks clubroom, leaves no doubt as to the substance of the instructions given by the plaintiff in error to McKechney in reference to drafting the assignment. That pencil memorandum is as follows:

"We agree to pay John Bentley one-third of any amount which may be due Ross & Ross after final judgment in the final court of resort. Certain obligations and undertakings have already been entered into by Ross & Ross, and it may be found necessary to enter into further obligations and undertakings to carry the suit through to a final settlement, and after payment of said obligations and undertakings the remaining amount shall be divided, one-third John Bentley, two-thirds Ross & Ross. And it is further agreed that this agreement shall be held in the custody of Mr. John McKechney, of the city of Chicago, as trustee, until a final adjustment is had."

Having elected to treat the amount involved in the assumpsit suit against the city as representing or standing in lieu of the net profits of the tunnel contract, plaintiff in error cannot now be heard to contend that this assignment should be reformed in that respect.

In this connection plaintiff in error insists that the bill should have alleged that the tunnel contract was completed at a profit, and that the burden was upon the defendant in error to show the amount of such profits before he was entitled to a reformation of the assignment, and also that the court erred in excluding evidence offered by the plaintiff

in error to the effect that he made no net profits out of the tunnel contract but said contract was completed at a great loss to him. For the reasons just above given the bill was not defective in the particulars pointed out, and no error was committed in excluding the offered testimony.

Plaintiff in error contends that the claim of the defendant in error is so inequitable that he should not be afforded relief in a court of chancery, and points out that by the decree of the circuit court defendant in error, in addition to his wages of $150 a month and board, is awarded the sum of $5496.77 for eight months' work. At the time of his employment as superintendent at the crib, in May, 1897, defendant in error was employed by plaintiff in error in the capacity of a foreman of bricklayers. According to the letters of plaintiff in error found in the record, the work was progressing in a very unsatisfactory manner. On May 4, 1897, plaintiff in error wrote defendant in error offering him the position of superintendent of the crib and putting him in full charge of the work, and explaining to him how unsatisfactorily the work had been progressing theretofore and expressing the hope and belief that the defendant in error would be able to get the work better organized and straighten out the difficulty. He offered him $150 a month and his board, and suggested that this might lead to something better. On May 20 he again wrote defendant in error, telling him that he had not visited the crib since the defendant in error had been made superintendent, for the reason that he did not want it said that defendant in error had not handled the job wholly himself. In this letter he gave explicit directions as to how he would like to have the work carried on, and told him he would see him personally within a few days. Three or four days after receiving this letter the plaintiff in error visited defendant in error at the crib, at which time he complimented him upon having gotten everything working in good shape On that occasion defendant in error informed plaintiff in error that

he did not desire to hold the position of superintendent, any longer; that it meant a twenty-four hour day; that the responsibility was great, and that he could receive more wages by working at his trade. Thereupon the plaintiff in error urged him to continue, telling him he would give him $150 a month toward his expenses and would give him one-third of the net profits of the work for his brains and labor. This proposition defendant in error testified he accepted. Under this arrangement he continued as superintendent at the crib until the following January, when the city took over the work. The consideration for this agreement was sufficient, and under the circumstances it cannot be said that it is so inequitable that a court of chancery will not afford relief.

It is urged that having in 1901 executed the release dated November 27, 1902, defendant in error is not entitled to the relief sought. As already pointed out, the evidence clearly discloses this release to be a forgery, and it is entitled to no weight or consideration whatever.

Plaintiff in error contends that at the time the assignment was executed by him the insertion of the number of the trover suit instead of the number of the assumpsit suit was deliberate, both on the part of himself and McKechney, and that it was done for the purpose of deceiving the defendant in error, who, according to the contention of the plaintiff in error, was by means of threats compelling him to execute this assignment to prevent the defendant in error from testifying against him. This contention is not supported by the evidence. It is clear from a preponderance of the testimony that the parties intended to make the assignment apply to the assumpsit suit and not to the trover suit, and that the number of the trover suit was inserted in the assignment by mistake and under such circumstances as entitles defendant in error to have the instrument corrected in that respect. The instrument itself, aside from the recital of the case number, bears conclusive evidence

that it relates to the matter involved in the assumpsit suit, for it recites that the interest assigned is in a claim against the city for damages under a contract for the construction of the water tunnel.

The five material questions of fact involved in this case,—(1) whether Ross agreed to give Bentley one-third of the net profits of the tunnel contract in consideration of Bentley continuing as superintendent; (2) whether the assignment in question was executed in order to reduce to writing the prior oral agreement; (3) whether the pencil memorandum of the assignment was written by W. J. Ross; (4) whether the general number of the trover suit was incorporated in said assignment instead of the general number of the assumpsit suit by a mistake of the parties; and (5) whether Bentley executed the release of November 27, 1901,—were all resolved by the master in chancery in favor of the defendant in error, and the decree of the circuit court on each of those questions is supported by a preponderance of the evidence.

Plaintiff in error objects to the fees allowed the master. The original report of the master was filed October 12, 1904. With this report was filed no statement or note whatever of the master's fees, the report in that respect being simply a memorandum following the signature of the master, as follows: "Master's fees, $......, paid by ............." It appears from a conversation had between the solicitors for the parties at the time the decree was submitted to the court, which is preserved in the record by a certificate of evidence, that prior to the filing of his report the master had required the defendant in error to advance to him the sum of $550 and the plaintiff in error to advance the sum of $466.50 to apply on his fees. It does not appear that the master's fees had been determined by the court prior to their payment, but these amounts seem to have been arbitrarily fixed by the master and payment required before the report would be filed. By its de-

cree the court found that the sum of $1016.50, being the
total of the amounts paid by the respective parties, was a
fair and reasonable compensation for the services rendered
by the master, and that sum was allowed to the master.
The decree further ordered that the sum of $550 paid to
the master by defendant in error be taxed as a part of the
costs and be re-paid to the defendant in error out of the
moneys then in the possession of the city of Chicago.   At
the time the decree was submitted for entry, solicitor for
plaintiff in error objected to the amount of the master's fees
as being unreasonable and excessive.   The court being of
the opinion that the fee was a reasonable and proper one,
entered the decree accordingly.   The plaintiff in error now
urges that the master's fees were improperly allowed for
the reason that they were not itemized as required by law.
Defendant in error insists that inasmuch as the plaintiff in
error only objected to the master's fees in the trial court
for the reason that they were unreasonable and excessive,
he cannot be heard now to object on the sole ground that
they were not itemized, and inasmuch as the only ground
urged in the Appellate Court was that the fees were not
itemized, he cannot now be heard to say that they were
unreasonable and excessive.

The master made no claim whatever for fees in con-
nection with his report.   The claim of the master for fees
should show the time he was necessarily employed in the
examination of questions of law and fact and in preparing
his report, and if the parties who are called upon to pay
the demands of the master object to the claim as presented
he should be required to support his claim with proof, and
the proof so produced should show the services rendered,
the time actually and necessarily devoted to the work, and
such other facts as would enable the court to intelligently
determine the rights of the parties.   (*Fitchburg Steam En-
gine Co.* v. *Potter,* 211 Ill. 138.)   It would be impossi-
ble for the court to pass upon an objection that the fees

claimed were unreasonable and excessive without having before it an itemized statement of the fees claimed. An objection, in a case where the master presents his claim in a lump sum, on the ground that it is unreasonable and excessive would necessarily include an objection that the fees were not itemized. Under the facts in this case no formal objection can be considered to have been made to the fees of the master. The master had presented no claim for fees, and there was nothing before the court for decision or upon which a ruling was required. Counsel could not object to a mere announcement of the court as to what the decree should contain in the way of an allowance to the master. The solicitor for plaintiff in error was contending, in an informal way, to the court that the proposed fees were excessive. If that was to be treated as a formal objection it became the duty of the court to require the master to prove up his fees, which would necessarily include itemizing them. There is no force in the contention that by thus objecting to the chancellor that the fees proposed to be allowed were unreasonable and excessive, plaintiff in error thereby waived his right in the Appellate Court, and in this court, to say that the fees were not itemized as required by law. It is apparent that plaintiff in error objected to each provision of the decree which was adverse to his interests, and it was not necessary that he make specific objection to the master's charge for fees in order to raise the question in the Appellate Court and in this court. (*Wirzbicky* v. *Dranicki,* 235 Ill. 106; *Keuper* v. *Mette,* 239 id. 586.) As the master presented no claim for fees, it was error for the court to allow anything except the statutory fees. The testimony reported consisted of 1274 typewritten pages. At the statutory rate of fifteen cents per hundred words, estimating 275 words per page, this would amount to $525.52.

The decree of the circuit court will be modified by striking out the provision allowing and taxing the master's fees,

and by inserting in said decree in lieu thereof the following language: "It is further ordered that the sum of $525.52 be allowed the master in chancery for taking and reporting testimony at fifteen cents per hundred words, upon which sum shall be credited $466.50 heretofore paid the master by the defendant. The balance, being $59.02, will be taxed as costs." In all other respects the judgment of the Appellate Court and the decree of the circuit court will be affirmed. The costs in this court shall be paid, two-thirds by plaintiff in error and one-third by defendant in error.

*Decree modified and affirmed.*