James C. Wilborn & Sons, Inc., a Corporation, Plaintiff-Appellant, v. William Vincent Heniff, et al., Defendants-Appellees.

Gen. No. 51,256.

First District, Third Division.

April 25, 1968.

Rehearing denied May 28, 1968.

Lewis W. Schlifkin, of Chicago (Edward A. Berman, of counsel), for appellant.

Mortimer & Hoffman, and Richard P. Szarmack, of Chicago, for appellees.

MR. PRESIDING JUSTICE DEMPSEY delivered the opinion of the court.

James C. Wilborn & Sons, Inc., the plaintiff, is a manufacturer of window sash and frames. Among its products is a wooden window with sash that tilts to the inside and is removable from the inside of a house—it is known as the "tilt-sash" window. The defendants, William Heniff, Joseph Vilcek and Joseph Skopec are former employees of Wilborn. Brandex Tilt-Sash, the corporate defendant, was organized by Heniff and by another employee of Wilborn, Peter Miller. As its name indicates, Brandex also makes a tilt-sash window.

In its complaint Wilborn charged the defendants with conspiracy and with pirating its trade secrets, customers' list, price schedules and business methods; inducing key employees to leave its employment; appropriating its samples; and manufacturing and selling windows which were identical with its own and palming them off as those of Wilborn. It prayed for an accounting and for a permanent injunction restraining the defendants from continuing their competition.

The charges were denied by the defendants and the case was referred to a master in chancery. The master's conclusions were in favor of the defendants. The chancellor also found that the equities were with the defendants, adopted the master's findings and recommendations and entered judgment accordingly. The costs and the

master's fee were assessed against the plaintiff. (In a prior appeal in this case, James C. Wilborn & Sons, Inc. v. Heniff, 56 Ill App2d 217, 205 NE2d 771 (1965), a temporary injunction was denied Wilborn; while in another suit, James C. Wilborn & Sons, Inc. v. Brandex Tilt Sash, Inc., 380 F2d 44 (1967), it was held that Wilborn's complaint for patent infringement stated a cause of action which gave the Federal Court jurisdiction of the subject matter, notwithstanding the factual determination by the chancellor in the present case that the equities were with the defendants.)

On appeal Wilborn contends that the court erred in not finding that it had an exclusive license to make and sell the tilt-sash window in Cook and surrounding counties: that the defendants were guilty of unfair competition, that they conspired to destroy its business, and that they appropriated its trade secret and trademark. Other contentions are that the master ruled improperly on matters of evidence and that the court erred in setting the fee to be paid to the master.

Wilborn started making tilt-sash windows in 1959. It makes this product pursuant to a license granted that year by the Tilt Sash Corporation. In making these windows it uses an alleged trade secret called a "variable blind stop." A blind stop is a strip of wood attached to a window frame to keep the sash in position. The "variable blind stop" is a vertical piece of wood of varying dimensions; it enables the sash to compensate for different wall thicknesses.

Heniff became a salesman for Wilborn about the time Wilborn received its license from Tilt Sash. Prior to this he had been employed as a salesman by the Five Star Window Company of Peru, Illinois. Peter Miller joined Wilborn as a salesman in 1961. In the summer of 1963 Heniff and Miller formed the Brandex company. Miller withdrew from Wilborn in September but Heniff did not

leave until January, 1964. While employed by Wilborn he purchased machinery for Brandex and otherwise participated in setting up its organization. Vilcek, foreman of the frame department at Wilborn, and Skopec, foreman of its sash department, (and three other employees) joined Brandex around the first of April 1964. Vilcek and Skopec testified that they were unhappy at Wilborn and, without being solicited, approached Heniff about working for Brandex. Heniff testified that he decided to leave Wilborn when he was informed that his sales commission would be cut in half.

Brandex started production in March 1964. Its window, which was made and distributed in the same territory as Wilborn's, was similar to Wilborn's. The mechanism and construction were the same, including the thickness of the blind stops. Two witnesses, who were in the sash and millwork business, testified that prospective customers would tend to be confused by the two units and could buy one thinking they were getting the other. Three witnesses, also in the same trade, testified that buyers would not be confused. They pointed out differences between the windows such as the trim and color and the material used in the hardware and pins. The emblems used on the two windows were distinctive in title, shape, color and typography, but both featured the words "tilt-sash" and bore the same trademark. However, there was testimony that the words "tilt-sash" were used by other window manufacturers including one (a maker of aluminum windows) in the Chicago area. The tilt-sash window was a patented product and the display of the trademark was required of all those who made or sold the window.

Soon after Brandex started its operation, Miller left a sample of the Brandex window with a customer to whom he had sold Wilborn windows. The customer turned the window over to Wilborn. The evidence showed that, although this window was distinguishable from

Wilborn's, it contained some Wilborn parts and bore the Wilborn emblem. Whether these parts were taken from Wilborn or were obtained on the market was not established. There is no evidence in the record that this mock-up window was used for the purpose of misrepresentation or deception. The fact that Wilborn's emblem was on it negates such a conclusion. The defendants' explanation was that the sample window was made in haste at the start of its business, when some Brandex parts were still unavailable, and was assembled to demonstrate the workability of its planned product.

A vice-president of Wilborn testified that the "variable blind stop" was a trade secret not used by anyone else in the industry. On the other hand, he testified that the Five Star Window Company used a blind stop that was somewhat similar to Wilborn's and that a company in Minnesota was using three of the four sizes of Wilborn blind stops. He further testified that the variable blind stop was pictured in Wilborn advertising; that cross-sectional drawings of the blind stop and its application were published in Wilborn catalogues; that the blind stop was not kept confidential and that anyone in the trade who wanted to make it would only have to follow the specifications in the catalogues.

The fact that a customers list was used was not disputed. The only difference was in the contentions of the parties in regard to the ownership of the list. Wilborn claimed that a private list was taken and used. The defendants claimed that the list belonged to Heniff. Heniff had brought a list of customers with him when he came to Wilborn; but Miller was given a list by Wilborn. While most of Brandex' customers were also customers of Wilborn, the evidence disclosed that Heniff and Miller were the only Wilborn salesmen handling the tilt-sash line and that they knew all Wilborn's customers. Further, as salesmen they received a monthly report of the

161

commissions they had earned together with a list of those who had made purchases the preceding month.

 Unfair competition exists where the defendant's conduct is likely to cause confusion in the trade as to the source of the products or is likely to lead the public to believe that the defendant is in some way connected with the plaintiff. Lady Esther v. Lady Esther Corset Shoppe, 317 Ill App 451, 46 NE2d 165 (1943). A conspiracy is a combination of persons to do an unlawful act or to perform a lawful act in an unlawful way. Reel v. City of Freeport, 61 Ill App2d 448, 209 NE2d 675 (1965). A conspiracy to injure another's business, when executed to his damage, is actionable. See Doremus v. Hennessy, 176 Ill 608, 52 NE 924 (1898). A trade secret is a plan or process, tool, mechanism or compound known only to its owner and those employees to whom it is necessary to confide. Snyder v. Hamilton, 39 Ill App2d 352, 189 NE2d 97 (1963).

 An employee is under an obligation not to divulge the trade secrets of his employer imparted to him in confidence. Schulenburg v. Signatrol, Inc., 50 Ill App2d 402, 200 NE2d 615 (1964). He is also under a duty not to take and use a customer list compiled by his employer, Boylston Coal Co. v. Rautenbush, 237 Ill App 550 (1925), though if he acts in good faith and without misrepresentation he may solicit customers whose names are obtained from memory. American Cleaners & Dyers v. Foreman, 252 Ill App 122 (1929). Furthermore, an agent must not put himself in a position which is adverse to that of his principal during the continuance of the agency. Moore v. Pinkert, 28 Ill App2d 320, 171 NE2d 73 (1961). Acts constituting violations of these duties are actionable in themselves, though they may also constitute part of an actionable conspiracy to injure the business of another.

 The master found that the defendants were not guilty of unfair competition; that they did not commit any actionable breach of trust by reason of their em-

ployment; that the "variable blind stop" was not a trade secret and that the only customers list in evidence was the one introduced by the defendants themselves and that this had been substantially prepared by Heniff before going to work for Wilborn. None of these findings was contrary to the weight of the evidence—let alone its manifest weight. Disputed questions of fact resolved by a master and approved by a chancellor will not be set aside unless they are against the manifest weight of the evidence. Guttman v. Schiller, 39 Ill App2d 58, 187 NE2d 315 (1963).

 The evidence did not sustain the plaintiff's allegation that the defendants competed unfairly or conspired to destroy the plaintiff's business. A review of the evidence indicates that the defendants merely exercised their right to leave one employment and form or join a rival business. Thus, this case is distinguishable from those cited by the plaintiff. The latter involve either the appropriation of a bona fide trade secret (e. g., Schulenburg v. Signatrol, Inc., supra) or a proven plot to destroy another's business (Duane Jones Co. v. Burke, 306 NY 172, 117 NE2d 237 (1954)). The defendant, Heniff, did not violate his duty of loyalty to Wilborn by forming Brandex and purchasing machinery for it while working for Wilborn. It is not necessarily a breach of duty for an agent to form a rival concern and purchase machinery for it while working for his principal (see e. g., Greenburg v. S. D. Childs & Co.,. 147 Ill App 477 (1909)), though it would be for an agent to continue to work for his principal after a rival corporation which he also served as agent begins business. Heniff immediately left Wilborn when Brandex commenced business. The defendants did not divulge a trade secret of their employer imparted to them in confidence as there was no trade secret for the defendants to disclose. The "variable blind stop" did not constitute a trade secret because it was already known and used by others in the

industry and in addition was disclosed to the trade through the plaintiff's advertising and catalogues. The evidence did not sustain the plaintiff's allegation that the defendants appropriated Wilborn samples or material and it did not sustain the allegation that they misappropriated its list of customers.

A basic factor in the master's finding that the defendants did not engage in unfair competition was his further finding that the Brandex company had as much right to use the tilt-sash name and trademark as Wilborn. This was the primary issue between the parties. The license Wilborn obtained from the Tilt Sash Corporation gave it the exclusive right to make and assemble the tilt-sash window in Cook and eight other counties in northern Illinois and Lake County, Indiana. Tilt Sash received its authority from the Western Engineering Trust—a trust which held the patents on the window guides and sash. Brandex obtained a license to make the window from the T. W. Sommer Company. Sommer received its authority from Western. Both Tilt Sash and Sommer were authorized by Western to issue sublicenses. The pivotal question at the hearing was whether Tilt Sash had the authority to grant an exclusive license to Wilborn.

The background facts are substantially these: The trustees of Western Engineering Trust were Michael J. Nardulli, Angelo F. Naples and Peter F. Nardulli. Michael Nardulli was the inventor of the tilt-sash window and was the managing officer of the trust. On October 1, 1953, Western granted a nonexclusive license to manufacture tilt-sash windows to the D. W. Company (also known as the Dodge Window Company). The president of the D. W. Company was Thurman J. Dodge. In the year 1956, at the time the 1953 contract expired, Dodge was the president of the D. W. Company, Michael Nardulli was vice-president and Naples was secretary. In February 1958, John J. Amos, who had bought 50 percent

164

of the company's stock, became its president. Naples continued on as secretary, and he, Dodge and Nardulli continued as directors. A fifth director, who came into the company with Amos, was Paul A. Cavett. Later in 1958 the name of the company was changed to Tilt Sash. It was Wilborn's contention that the D. W. Company entered into a new agreement with Western which gave it the exclusive license to make the tilt-sash window and that this agreement was dated October 31, 1956. No contract of this date, and no exclusive contract of any date, was produced by Wilborn.

In an attempt to establish the existence of the October 31, 1956, contract Wilborn called six witnesses. Three of its witnesses said they remembered seeing such a contract; three of its witnesses said there was no such contract. Amos testified that in 1958, the year he became associated with the D. W. Company, he saw the contract on two occasions and that he again saw it in 1959. He also said that in January 1958 Michael Nardulli told him that there was such a contract. Cavett testified that in 1958 he saw an exclusive contract which was dated October 31, 1956. An attorney for another window manufacturer, who represented his company in 1959 in a matter involving Tilt Sash, stated progressively (1) that he did not see an exclusive license agreement between Western and Tilt Sash; (2) that he saw an agreement but did not remember its contents; (3) that he believed it was an exclusive agreement, and (4) that he was positive it was an exclusive agreement. In contrast, Dodge, Nardulli and Naples testified that there was no contract bearing the date October 31, 1956, and that Tilt Sash never received an exclusive license of any kind from Western. They said that a contract was agreed upon in 1956 which was identical with that of 1953 except that it added some patents and modified the units that the D. W. Company had to purchase and the

165

royalties it had to pay. They testified that the new contract was executed on December 31, 1956, and that this contract remained in force until June 1, 1958, when it was again modified, this time at the request of Amos.

The contracts of December 31, 1956, and of June 1, 1958, were received in evidence. Neither contract provided for an exclusive license.

In a further effort to establish an October 31, 1956, contract, the plaintiff questioned Dodge, Nardulli and Naples about the D. W. and Tilt Sash corporate minutes. Their attention was called to minutes which referred to an exclusive licensing agreement dated October 31, 1956. For example, the minutes of November 1, 1956, stated:

> "The chair stated that the purpose of the meeting was to approve and accept Exclusive License Agreement from Western Engineering Trust, dated October 31, 1956.

> "The chair explained that the Exclusive License Agreement gives Dodge Window Company the exclusive right for the manufacture, sale and right to sublicense, of patents covering sash guides and related window structures.

> "After reviewing the License Agreement, the following resolution was unanimously carried:

> "RESOLVED:

> "That Dodge Window Company accept the Exclusive License Agreement dated October 31, 1956, between Dodge Window Company and Western Engineering Trust.

> " . . .

> " . . .

> > AFN Angelo F. Naples
> > Secretary

166

"Approved:

"TJD Thurman J. Dodge

"MJN Michael J. Nardulli."

The witnesses testified that the minutes did not accurately reflect the true picture. It was explained that while the date of October 31, 1956, was in the minutes and while an exclusive license was discussed, no agreement was reached with Western as of that date; that a final agreement did not materialize until December 31, 1956. It was further suggested, by way of explanation for the appearance in later minutes of the October 31st date and the word "exclusive," that an initial error had been carried over into subsequent records.

More evidence on the subject was produced by the defendants. An attorney who represented Amos in his 1958 acquisition of the D. W. Company testified that he did not recall an exclusive license dated October 31, 1956. Moreover, a letter which he had written in March 1958 acknowledged that there had been placed in his hands an:

"Executed copy of Agreement, dated December 31, 1956, between Western Engineering Trust and D. W. Co., whereby Western Engineering grants certain licenses to D. W. Co. for certain sash guides and window sash construction embodying inventions covered by the licensor's patents."

The defendants introduced another letter in evidence. This one was written by Western's patent attorney and a copy of it had been sent to Amos. The letter was written more than a year before Brandex was organized and was about a possible patent infringement which was of concern to Western and Wilborn. The attorney pointed out that Western would have to be the sole plaintiff and responsible for fees and costs in any patent litiga-

167

tion because the D. W. Company did not hold an exclusive license.

Wilborn concedes that in order to sustain its claim to an exclusive license it must rely upon the agreement between Tilt Sash and Western. The master concluded that the testimony of Wilborn's own witnesses conclusively established that Western never granted an exclusive license to Dodge Window or to Tilt Sash. A painstaking review of the whole record and an examination of the exhibits (those refused as well as those received in evidence) convinces us that the finding of the master and its approval by the chancellor were completely justified. Since Tilt Sash was not granted an exclusive license by Western it had no authority to grant an exclusive license to Wilborn. Since Wilborn did not possess an exclusive license it cannot complain that the defendants used the tilt-sash name, patents and trademark.

Wilborn more than once offered the corporate minutes in evidence, but objections were made and the master sustained the objections. Wilborn assigns this as error. It principally maintains that the master erred in refusing to permit it to use the minutes to refresh the memories of its witnesses. Only once, however, in arguing in support of its motions to introduce the exhibits, did the plaintiff state that its purpose was the refreshment of a witness' recollection. This witness, Thurman Dodge, had not been asked if his memory needed refreshing, and he did not state that his memory was exhausted; nor did the plaintiff claim surprise at his testimony. Despite the lack of a proper foundation the exhibit was used to refresh his memory. He stated: "I have just read this document and [the statement therein] was a true statement at that time. . . ."

Furthermore, the plaintiff freely used the minutes for the purpose of refreshing the witnesses' memories. The three witnesses who stated that Tilt Sash did not have an exclusive license and had no contract with Western dated

October 31, 1956, were shown those minutes which contained references to such a license and contract. After looking at some of the exhibits, Dodge and Naples stated that their recollections were refreshed, while Nardulli stated that his was not refreshed. Thus, it is clear that the real reason behind the plaintiff's persistent questioning of its own witnesses was not to refresh their memories and was not because it was taken by surprise by their adverse testimony, but was an attempt to impeach their testimony and to thereby indirectly establish the existence of an October 31, 1956, contract.

The plaintiff succeeded in making the point that the minutes tended to contradict the witnesses' testimony and it thus got the ultimate value out of their use. The master was fully exposed to them. The complete contents of those which were most crucial were repeatedly disclosed during the hearing; the minutes were read and reread, frequently aloud; their significant passages were referred to and re-referred to; the most important ones were also attached to the plaintiff's complaint. It is apparent from the record that they would not have affected the master's judgment if he had admitted them in evidence. It is apparent that the master believed the testimony of Wilborn's own witnesses, Dodge, Nardulli and Naples, who were in the best position to know whether there was an exclusive license and an October 31, 1956, contract; he ruled that the contracts before him—those of December 31, 1956, and of June 1, 1958—established the Tilt Sash-Western agreement, not a purported contract, whose very existence was in dispute. The plaintiff was in nowise prejudiced by the exclusion of the corporate minutes.

The final contention of the plaintiff is that the chancellor erred in assessing the master's fee. The master did not itemize the time spent on the charges comprising his report and because of this the plaintiff contends

169

that his fee should be disallowed. The defendants respond that the transcript of proceedings reveals all the hearings held by the master, the witnesses present at the hearings and the evidence offered, and that this is an adequate breakdown of the services performed. No authority is cited in support of this response. The master apparently did not think the defendants' generalization was an adequate answer to the plaintiff's attack and he asked for and was granted leave to file suggestions in support of the decree fixing his fee. He argues that the plaintiff waived its right to assign lack of itemization as error because in the trial court its only objection was that the fees were improper and excessive. The master also states that he testified that he spent in excess of 175 hours on the case and that the plaintiff did not cross-examine him.

In Clokey v. Wabash Ry. Co., 353 Ill 349, 187 NE 475 (1933), the court said:

> "It is the law that the fees of the master in chancery should be itemized, and if found proper by the court it shall fix such allowance; also, that an allowance of the master in chancery's fees should not be made in gross."

In Fitchburg Steam Engine Co. v. Potter, 211 Ill 138, 71 NE 933 (1904), the court said:

> "The parties who are called upon to pay the master should not be required to defend against demands for amounts in gross, but have the right to know the specific service for which they are to be called upon to make payment. The claim of the master should be so itemized as to distinctly show the service which he has rendered for which he claims the right to make a charge."

In Litwin v. Litwin, 375 Ill 90, 30 NE2d 619 (1940) the master's certification for fees, like the master's certifi-

170

cation in the present case, was for: "Obtaining files; examining order of reference; docketing cause, setting same for hearing; attending hearings; hearing and considering testimony and pleadings and preparing report. . . ." The court held that itemization of masters' fees is required and stated that where a charge is made in a lump sum nothing would be allowed for the services covered by the gross charge. For other cases in which nothing was allowed a master who failed to itemize his charges see: Norton v. Jordan, 360 Ill 419, 196 NE 475 (1935) and Wirzbicky v. Dranicki, 235 Ill 106, 85 NE 396 (1908).

In support of his argument that the plaintiff's objection has been waived, the master cites the case of Eulette v. Zilske, 222 Ill App 128 (1921) in which it was said: "It is contended that the master's fees were not properly itemized. No objections or exceptions were made on this subject. The contention is therefore untenable." However, the court in Bentley v. Ross, 250 Ill 182, 95 NE 182 (1911) held otherwise. The court said:

> "The plaintiff in error now urges that the master's fees were improperly allowed for the reason that they were not itemized as required by law. Defendant in error insists that inasmuch as the plaintiff in error only objected to the master's fees in the trial court for the reason that they were unreasonable and excessive, he cannot be heard now to object on the sole ground that they were not itemized. . . .

> ". . . It would be impossible for the court to pass upon an objection that the fees claimed were unreasonable and excessive without having before it an itemized statement of the fees claimed. An objection, in a case where the master presents his claim

in a lump sum, on the ground that it is unreasonable and excessive would necessarily include an objection that the fees were not itemized."

██ ██ A court of review has the discretion whether to remand a case for further proceedings on the question of fees. Morris v. North Evanston Manor Bldg. Corp., 319 Ill App 298, 49 NE2d 646 (1943). Despite the failure of the master to itemize his charges, this case is a proper one for remandment. The record is 3,088 pages long, the exhibits are numerous, and the abstract consists of 247 pages. When examined by the chancellor the master swore that he spent 175 hours on all aspects of the case. It would be unjust to deprive him of compensation for his hours of labor. The cause will, therefore, be returned to the trial court with directions to permit the master to amend his certificate and properly submit his charges and to permit the parties to raise objections thereto if they see fit. With this exception the decree is affirmed.

Affirmed in part and reversed in part. Remanded with directions.

SCHWARTZ and SULLIVAN, JJ., concur.