ARMOUR AND COMPANY, Plaintiff-Appellant, *v.* UNITED AMERICAN FOOD PROCESSORS, INC., *et al.*, Defendants-Appellees.

First District (4th Division) No. 62084

Opinion filed March 10, 1976.—Rehearing denied April 29, 1976.

Charles J. Merriam, Allen H. Gerstein, and Michael F. Borun, all of Chicago (Merriam, Marshall, Shapiro & Klose, of counsel), for appellant.

Rudnick, Wolfe, Snyderman & Foreman, of Chicago (Lester D. Foreman, Stephen A. Landsman, and Joseph W. Sheyka, of counsel), for appellees.

Mr. PRESIDING JUSTICE JOHNSON delivered the opinion of the court:

This is an appeal from an order denying the issuance of a preliminary injunction against defendants for allegedly participating in certain unfair methods of competition against plaintiff and its business.

Plaintiff, Armour and Company, through its wholly owned division Pfaelzer Brothers (Pfaelzer hereinafter), is engaged in the mail order sale and distribution of meat products. Defendant United American Food Processors, Inc. (United), through its Gourmet Fare division, is also engaged in the sale and distribution of meat products by mail. Two former employees of plaintiff, Charles E. Hersheway and Patricia A. Linderoth, were joined as individual defendants to the action. Hersheway was employed by Armour in September 1964 and assigned to Pfaelzer. He executed Armour's "Employee Patent and Trade Secret Agreement" approximately 1 year later. When Hersheway terminated his employment in September 1974, he was general manager and chief operating officer of Pfaelzer. He subsequently commenced employment with defendant United as president of its Gourmet Fare division. Defendant Linderoth was employed by Armour in November 1970, and

executed the patent and trade secret agreement at that time. When she resigned in August 1974, she was director of special marketing at Pfaelzer. Linderoth also obtained a position with United's Gourmet Fare division.

Armour's "Employee Patent and Trade Secret Agreement" provides in pertinent part:

> "*  *  * [T]hat as a result of his employment by ARMOUR he has in the past or may in the future develop, obtain or learn about trade secrets or confidential information which is the property of ARMOUR, and EMPLOYEE agrees to use his best efforts and the utmost diligence to guard and protect said trade secrets and confidential information, and EMPLOYEE agrees that he will not during or after the period of his employment by ARMOUR, use for himself or others, or divulge to others any of ARMOUR'S trade secrets or confidential information which he may develop, obtain or learn about during or as a result of his employment by ARMOUR, unless authorized to do so by ARMOUR in writing. EMPLOYEE further agrees that if his employment by ARMOUR is terminated for any reason, he will not take with him but will leave with ARMOUR all records and papers and all matters of whatever nature which bears ARMOUR'S secret or confidential information."

The contract further recites that:

> "*  *  * '[T]rade secrets' and 'confidential information' may include  *  *  * lists of customers or any information of whatever nature which gives to ARMOUR an opportunity to obtain an advantage over its competitors who do not know or use it, but it is understood that said terms do not include knowledge, skills or information which is common to the trade or profession of EMPLOYEE."

Shortly after Hersheway joined United, he began to compile a list of former Pfaelzer customers whom he intended to contact to solicit business for Gourmet Fare. He hired his former secretary, Mrs. Lynn Hynes, who had been responsible for compiling and maintaining Pfaelzer's "preferred customer list." She was requested to identify any Pfaelzer customers that she could remember. Names were suggested by Hersheway and Linderoth as well as Hynes in meetings held in Linderoth's home until their offices were ready. Hynes provided at least 60 to 80 names of Pfaelzer customers. A "prime list" of prospective customers was finally developed which included 198 names which, by comparison, were identical with customers on Pfaelzer's preferred list.

On December 23, 1974, Armour filed suit against United, Hersheway

and Linderoth. The complaint sought various types of relief: the immediate return of all materials and copies allegedly misappropriated from plaintiff by Hersheway and preliminary and permanent injunctions against defendants, their agents and employees (1) preventing any personal, telephone, mail or other contact with any person, directly or indirectly, through use of the misappropriated material; (2) requiring them to refrain from filling any orders acquired through use of misappropriated material and to turn over such orders and all inquiries concerning them to plaintiff; (3) preventing the distribution of brochures or other promotional materials likely to cause confusion of the public between the goods and services offered by plaintiff and those offered by defendant; and (4) preventing further acts of unfair competition. In addition, plaintiff sought an accounting for all gains, profits and advantages derived as a result of the unfair competitive acts, damages sustained, costs of litigation and attorneys fees.

The trial court conducted a hearing on plaintiff's motion for a preliminary injunction. During the course of the proceedings, plaintiff admitted that its motion was unduly broad and stated that no relief with regard to the alleged physical taking would be requested. Consequently, plaintiff limited the interlocutory relief sought to an injunction against the use or disclosure of confidential information as to trade secrets, particularly with respect to Pfaelzer customers. At the close of plaintiff's case, defendants moved for a finding in their favor. On May 27, 1975, the trial court granted defendants' motion and denied plaintiff's motion for a preliminary injunction.

■■ The sole issue before this court is whether the trial judge erred in refusing to grant a preliminary injunction under the circumstances of this case. While the grant or denial of an interlocutory injunction rests in the sound discretion of the trial court, the decision is subject to appellate review—limited, however, to the inquiry of whether the trial judge abused his discretion. (*Schlicksup Drug Co. v. Schlicksup* (1970), 129 Ill. App. 2d 181, 186, 262 N.E.2d 713.) It is not the purpose of a preliminary injunction to determine controverted rights or decide the merits of a case. (*Nemirow v. Kuhn* (1971), 133 Ill. App. 2d 604, 607, 273 N.E.2d 532.) Instead, its purpose is to preserve the status quo which is the last actual, peaceable, uncontested status which preceded the controversy. (*Schlicksup Drug Co. v. Schlicksup* (1970), 129 Ill. App. 2d 181, 187, 262 N.E.2d 713.) Therefore, this court will look to the sufficiency of the evidence for the sole purpose of determining whether the trial court abused its discretion by not granting the requested injunction.

■■ In order for a preliminary injunction to issue, the petitioner must establish a need to preserve the status quo in order to prevent

irreparable injury for which there is no adequate remedy at law, and a likelihood of success on the merits. (*Amber Automotive, Inc. v. Illinois Bell Telephone* (1973), 15 Ill. App. 3d 769, 770, 305 N.E.2d 270.) These requirements will be considered separately in light of the evidence presented by plaintiff.

Plaintiff contends that irreparable injury will be caused by use and divulgence of its customer list in violation of the agreement signed by Hersheway and Linderoth. According to the testimony presented at the hearing, Pfaelzer's customer lists are the product of a direct marketing technique which is very expensive but extremely important since its business is derived almost exclusively from mail order solicitations. Pfaelzer solicits many prospective customers at a time through dissemination of hundreds of thousands of catalogs and brochures. The mailing lists used include Pfaelzer's confidential list of approximately 43,000 actual customers.

The "preferred customer" list, however, is prepared from a confidential card index system which identfies those actual customers who have purchased a significantly large quantity of products, minimum worth $300, in the preceding year. Because of the high volume of business the preferred customers represent, the list is considered a confidential document, kept under lock and key, and used to make personal contact with such customers as a follow-up to the mailing of the Christmas holiday brochures. Pfaelzer had about 1000 preferred customers at the time Hersheway and Linderoth terminated their employment.

Without expressing any opinion as to plaintiff's contention that its preferred list is a trade secret, we note that the preferred customers were considered to be the cream of Pfaelzer's business. By way of comparison, the testimony of the general manager showed that a good response to a general mailing of 600,000 would be 2½ to 4 percent while a good response to the actual customer list of 43,000 would be 17 or 18 percent. With respect to the preferred customer list, however, the response could be as high as 50 percent. Such a response is a clear indication of the high value of the list.

The identification of a source of valuable customers who are not generally known throughout the trade is clearly an asset to a business dependent on customer solicitation and contact. It is undisputed that the individual defendants had access to Pfaelzer's preferred list as a sole consequence of their employment responsibilities. Lists of customers compiled in the course of business have been recognized by the courts as valuable assets and protected against improper use by persons who have gained knowledge of them by virtue of their employment. *B. R. Paulsen & Co. v. Lee* (1968), 95 Ill. App. 2d 146, 153, 237 N.E.2d 793.

"It is clear that an employee may take with him, at the

termination of his employment, general skills and knowledge acquired during his tenure with the former employer. It is equally clear that the same employee may not take with him confidential particularized plans or processes developed by his employer and disclosed to him while the employer-employee relationship exists, which are unknown to others in the industry and which give the employer advantage over his competitors." (*Schulenburg v. Signatrol, Inc.* (1965), 33 Ill. 2d 379, 387, 212 N.E.2d 865.)

An employer is entitled not to have his old customers enticed away from him under Illinois law. (*Snyder v. Hamilton* (1963), 39 Ill. App. 2d 352, 365, 189 N.E.2d 97.) If defendants are permitted to solicit Pfaelzer's preferred customers, plaintiff's relationship with its most valuable customers may be impaired with the consequence that plaintiff may lose business. We think that irreparable injury was established by plaintiff's evidence and nothing more.

Defendants argue that irreparable injury has not been shown because plaintiff failed to prove any aggressive solicitation of its preferred customers, or any customer defection and monetary loss. However, this contention ignores the fact that preliminary injunctive relief is fashioned to prevent the danger of future loss. The evidence here showed that approximately 20 percent of Pfaelzer's preferred customers appeared on Gourmet Fare's "prime list" which was prepared by Hersheway for solicitation purposes. There is no requirement that a court must wait until an injury occurs before granting relief. (*Fink v. Board of Trustees* (1966), 71 Ill. App. 2d 276, 282, 218 N.E.2d 240.) In any event, plaintiff's supposed inability to show monetary loss actually supports the proposition that a proponent must show it is sustaining or about to sustain an injury which would be irreparable by money damages alone. *Veach Oil Co. v. Ogilvie* (1974), 22 Ill. App. 3d 233, 235, 317 N.E.2d 328.

Plaintiff must also establish a probability of success on the merits before a preliminary injunction may issue. However, absolute certainty of plaintiff's ultimate success is not required provided plaintiff makes out a prima facie case for final relief. (*Gifford v. Rich* (1965), 58 Ill. App. 2d 405, 408, 208 N.E.2d 47.) What is required is that the movant raise a fair question as to the existence of the right claimed, lead the court to believe he will be entitled to relief prayed for if the proof and law sustain his allegations, and make it appear advisable that the positions of the parties remain the same until the merits of the case are considered. (*Frederick Chusid & Co. v. Collins Tuttle & Co.* (1973), 10 Ill. App. 3d 818, 821, 295 N.E.2d 74.) We believe that the pleadings and evidence made out such a case.

The right claimed by the plaintiff is based on Armour's "Employee

Patent and Trade Secret Agreement" executed by Hersheway and Linderoth. Again we emphasize that this court takes no position on the issue of whether the customer list was a protectable trade secret, for this is a substantive issue to be determined at a trial on the merits. However, the agreement itself explicitly provided that after his employment was terminated, the employee would not use for himself or others, or divulge to others, any of Armour's trade secrets or confidential information which he obtained as a result of his employment. The contract also contained a recital that the "trade secret" or "confidential information" could include lists of customers.

Confidential information has been protected from disclosure to a competitor by Illinois courts. In *Boylston Coal Co. v. Rautenbush* (1925), 237 Ill. App. 550, the complainant sought an injunction to prevent the defendants from wrongfully appropriating certain confidential information of the complainant which had been obtained by one of the defendants, Rautenbush, while an employee of the complainant. The evidence established that a large amount of labor and money had been expended to compile a list of "good agents" for complainant's mail order coal business. The list as finally formed was the result of continual advertising and weeding out of names, which in the aggregate amounted to 250,000 persons, until a reduced list of 8000 or 9000 had been developed. A thousand of those were considered good agents and through their combined efforts, they sold enough coal to make complainant's business profitable. Rautenbush, as sales manager, had obtained the list in the course of his duties and used it for the benefit of a competing firm of which he had become a member. The court found that use of the list, which was entirely unique and in itself a source of sales and profits, was a violation of plaintiff's property rights and, further, that the employee was bound not to disclose or use confidential matter which he gained by reason of his former employment.

■■ The case at bar is strikingly similar to *Boylston* in that Pfaelzer's preferred customer list was developed only by expending a great deal of money and was a source of sales and profits. In addition, plaintiff's case for a preliminary injunction is strengthened by the existence of the employment agreement prohibiting use and divulgence of trade secrets and confidential information. It is well settled by the decisions of courts of this country that equity will restrain an employee from making disclosures or use of trade secrets communicated to him in the course of a confidential employment, and particularly if he has contracted not to do so. (*Victor Chemical Works v. Iliff* (1921), 299 Ill. 532, 547, 132 N.E. 806.) The contract is significant in view of the fact that some cases have indicated that confidential information would not be protected

in the absence of an express agreement. *Ellis & Marshall Associates, Inc. v. Marshall* (1973), 16 Ill. App. 3d 398, 405, 306 N.E.2d 712; *American Cleaners & Dyers v. Foreman* (1929), 252 Ill. App. 122, 126.

Defendants cite *Revcor, Inc. v. Fame, Inc.* (1967), 85 Ill. App. 2d 350, 228 N.E.2d 742, as support for the proposition that an employee cannot be prevented from seeking out a former employer's customers with whom he has had regular contact in the course of his employment. It should be noted that defendants have made no showing of any personal contract on the part of Hersheway or Linderoth with Pfaelzer's preferred customers. In any event, defendants have ignored the caveat of the *Revcor* decision which provides that if the employee agreed to a restrictive covenant in his employment contract, or if the names of actual or potential customers are confidential, not publicly listed or otherwise readily available, then the employee might, under proper circumstances, be enjoined from soliciting business from those customers. We think that the circumstances of this case fall within the *Revcor* exception.

Defendant's reliance on *Kalnitz v. Ion Exchange Products, Inc.* (1971), 2 Ill. App. 3d 158, 276 N.E.2d 60, is also misplaced. While the court did hold that a former salesman of a corporation was not prohibited from soliciting customers with whom he had a personal relationship, two factors distinguish that case from the one at bar. First, the record there was devoid of evidence establishing the confidentiality of the customer lists. Second, as the court pointed out, there was no contract in existence to control the defendant's actions.

■■ We think it advisable that the positions of the parties remain as they were before the controversy. With plaintiff's case, and nothing in rebuttal, a prima facie case has been made out which is sufficient for the issuance of a preliminary injunction—the purpose of which is to secure emergency relief restoring the parties to the status quo ante litem. (*Wessel Co. v. Busa* (1975), 28 Ill. App. 3d 686, 693, 329 N.E.2d 414.) We therefore hold that plaintiff's motion for a preliminary injunction was proper and that the trial court abused its discretion in denying it.

For the foregoing reasons, the order of the circuit court denying the issuance of the temporary injunction is reversed and the cause is remanded with instructions to enter the injunction pending disposition on the merits.

Reversed and remanded.

DIERINGER and ADESKO, JJ., concur.