ABC TRANS NATIONAL TRANSPORT, INC., d/b/a ABC-Air Freight, Plaintiff-Appellant, *v.* AERONAUTICS FORWARDERS, INC., *et al.*, Defendants-Appellees.

First District (5th Division)   Nos. 79-675, 79-977, 79-978 cons.

Opinion filed October 31, 1980.—Rehearing denied December 31, 1980.

Stephen C. Sandels, John T. Schriver, Brian S. Hucker, and John R. Doyle, all of Chicago (McDermott, Will & Emery, of counsel), for appellant.

Friedman & Koven, of Chicago (Robert S. Jacobs and Lawrence M. Templer, of counsel), for appellee Franklin Rand Weiss.

Irving M. Drobny and Gerald M. Chapman, both of Chicago, for certain other appellees.

Mr. JUSTICE WILSON delivered the opinion of the court:

These consolidated appeals are taken from the lower court's orders which denied plaintiff's request for injunctive relief and which found defendant Weiss not liable to plaintiff. Plaintiff also appeals from the amount of damages that it was awarded. Cross-appellants defendants appeal from the adjudication of their liability to plaintiff. We affirm the judgment.

ABC Trans National Transport, Inc. (ABC-TNT), instituted this action on February 6, 1978, to enjoin defendants, who were key employees of plaintiff, from diverting plaintiff's personnel and customers to Aeronautics Forwarders, Inc. (Aeronautics), a competing firm. On January 31, 1978, over 30 of plaintiff's employees walked off the job and began working for Aeronautics. Over half of plaintiff's business was lost to Aeronautics immediately thereafter. Plaintiff's major allegation is that defendants conspired to effectuate the massive departure and the subsequent losses to ABC. Defendants are charged with breaching their fiduciary duties, fraud, and interfering with contractual relations.

This litigation was previously before this court on an interlocutory appeal. (*ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.* (1978), 62 Ill. App. 3d 671, 379 N.E.2d 1228 (*1978 ABC Opinion*).) At that time the plaintiff appealed the trial court's denial of a preliminary injunction at the close of plaintiff's evidence. We found the ruling to be an abuse of discretion and remanded the cause for further proceedings. Subsequently, after a hearing on the merits, the lower court held all defendants except Weiss to be liable to plaintiff and awarded damages, but denied the permanent injunction.

FACTS

Plaintiff ABC-TNT is a private corporation engaged in transporting freight over land and by air. Its separately operated air freight division, ABC Air Freight (ABC), acts as an intermediary between customers, air carriers, and ground cartage companies. Nationwide there are approximately 250 companies competing in the air forwarding business. It is a highly competitive industry that puts a premium on aggressive salespersons who establish and maintain a personalized relationship with clients and customer service personnel.

In 1969, ABC was operating at a loss, and defendant Robert Agnes was hired as president of ABC. Agnes subsequently hired defendants Edward Brownstein, David Eades, Carl Cohen, Al Krause, and Bernard Marco. Just before this controversy arose, Brownstein was the regional vice president in charge of ABC stations in Chicago, Boston, Kansas City, and Houston; Eades was vice president in charge of the New York station; Cohen was vice president in charge of Philadelphia; and Krause and

Marco were vice presidents in charge of the Los Angeles station. In addition to their supervisory roles, these men also solicited and maintained clients.

By 1973, ABC had become profitable. Pursuant to his contract with ABC, Agnes received 10% of the yearly profits. ABC-TNT withdrew the remaining 90%. This practice became a major point of contention between Agnes and ABC-TNT because Agnes believed that the 90% profits should be retained and invested by ABC so that his 10% share of the profits could be increased in succeeding years. At the end of September 1977, Agnes conditioned the renewal of his contract upon the funds being left in ABC. He thereupon tendered his resignation, which eventually was accepted by Leon Mitchell (president of ABC-TNT) and Arthur Brown (chairman of the board and owner of all ABC-TNT's stock).

On about January 24, 1978, Mitchell first learned from ABC employee Diane Virzi that defendants had organized a competing air forwarder, Aeronautics Forwarders, Inc. (Aeronautics), and planned to walk out en masse with other ABC personnel. On the 30th of that month, ABC-TNT supervisory personnel appeared at ABC offices in Philadelphia, Boston, Chicago, New York and Los Angeles. In Chicago, Brownstein was fired. At the other stations, each defendant vice president was asked to remain with ABC, but each refused and left ABC. The following day, more than one half the employees of the major ABC stations had resigned from ABC and joined Aeronautics. Simultaneously, fifty percent of ABC's business, including most of its major customers, switched over to Aeronautics. In addition, various items of personal property, such as customer files, had been removed. Thereafter, plaintiff took several measures to recapture its lost customers and business, including the filing of this action for injunctive relief.

In the summer of 1978, this court heard plaintiff's interlocutory appeal from the lower court's order which granted defendants' motion to deny the petition for a preliminary injunction. We held that plaintiff had established a *prima facie* case for a temporary injunction and that the lower court's ruling was an abuse of discretion. (*1978 ABC Opinion*, 62 Ill. App. 3d 671, 686-87, 379 N.E.2d 1228, 1239.) On remand, defendants presented their case, and plaintiff offered rebuttal evidence. The parties stipulated that the 1979 hearing would constitute the trial on the merits.

The record before us is voluminous and the foregoing fact summary merely provides an overview of the circumstances of this case. For purposes of clarity, therefore, a more detailed description of the evidence is necessary. Based on all the evidence from the 1978 and 1979 hearings, we find that the chronology of events leading to the January 31 walkout may be summarized as set forth below.

In 1975, defendant Weiss began negotiations for the purchase of

Aeronautics on behalf of Fifty States Freight Corp., formed by Perry and Mildred Zenlea. At the time, Weiss was an attorney for ABC. The purchase was consummated in March 1976.

In April of 1976, Larry Lindell, a principal of ABC's Los Angeles cartage agent, Zip Delivery, received a letter from Aeronautics, requesting his services. Zip Delivery was under exclusive contract to ABC. Lindell made a few deliveries for Aeronautics until mid-1977. Bernard Glazer, a commissioned salesman for ABC and part owner of Zip Delivery testified that defendant Marco intimated that "big things" were going to happen concerning another air forwarding company and that Zip Delivery would be the sole cartage agent for this company.

In 1976 and 1977, various defendants discussed Aeronautics with each other or with third persons. It was not until Agnes tendered his resignation in September of 1977, however, that Aeronautics' activities accelerated. Defendant Brownstein told Barbara Crane, an ABC saleswoman, that the move from ABC to Aeronautics was to take place in February of 1978 and that "there was no turning back now." In a meeting in St. Louis, several of the defendants met with Marty Kusman, the ABC vice president in St. Louis, to persuade him to join Agnes and the others in leaving ABC.

On September 30, 1977, Brownstein called together the Chicago customer service employees and swore them to secrecy. He told them of the planned walkout. Diane Virzi testified during the 1978 hearings that Brownstein told them that ABC-TNT was going out of business and that ABC was doomed; that Krause, Marco, and Agnes had invested in another air freight company that was already operating in Los Angeles, Boston, and Philadelphia; that certain ABC clients had been informed of the situation and had offered to do business with Aeronautics; that ABC employees across the country were being notified and that secrecy was important because Agnes was under contract and could get into trouble if ABC learned of the plan.

In late 1977, defendants began setting up the physical facilities of each of the Aeronautics stations, renting office space and installing telephones. In addition, Aeronautics arranged for financing and ordered air bills, envelopes and other printed matter. At about this time, Brownstein attempted to get ABC's Houston station manager to leave ABC. Arthur Brown and Leon Mitchell spoke to Brownstein, Marco, Krause, Eades, and Cohen to ask each of them what effect, if any, Agnes' departure from ABC would have and whether they would take over Agnes' position as president of ABC. Each declined the offer, citing personal reasons.

In December 1977, Brownstein met with ABC salespersons Crane,

Don Spandoni, and Tony Ill and told them that the move to Aeronautics would occur in February or March. Crane testified at the 1979 hearings that defendant Brownstein said that "[t]he other cities, the other vice presidents, and most of the office personnel, were going to go along—go with Bob [Agnes] and all of us—when we left, * * * [that] when we all left ABC there would be no life left."

In mid-December of 1977 Krause and Marco met with Lindell and Glazer to discuss the cartage agents' switchover to Aeronautics. According to Glazer's and Lindell's testimony, they were offered shares of Aeronautics' stock. Glazer testified that Marco approached him after the meeting to tell him that Glazer's share of stock would be increased from 7,500 to 10,000 and that Marco would personally give Glazer an additional 5,000 shares from his own shares.

In January of 1978, Brownstein again met with Barbara Crane and Spandoni and Ill to discuss final preparations for the walkout. That same month, Barbara Crane noticed that cartons of air bills with Attorney Weiss' New York address on them were in Brownstein's office. At Brownstein's direction, Barbara Crane addressed over 2,000 Aeronautics air bills with ABC's addressograph machine and customer cards.

In Los Angeles, Marco and Krause told Melissa Walker, a customer service employee, about the new company and asked her to join them. They told her that if she decided to stay with ABC she could be their spy. One of ABC's Los Angeles salespersons told ABC account Teac, Inc.'s, traffic manager to give its business to Aeronautics and left airbills for his use.

During the first week of January 1978, Marco told Glazer that the walkout was planned for February 20, 1978. Later in the month Marco told Glazer that he had ordered shipping containers at ABC's expense and that he'd tell Glazer when to pick them up. Lindell picked up an Aeronautics' shipment originating in Chicago and delivered it to a Los Angeles customer. Krause told Glazer to begin switching ABC accounts to Aeronautics in late January 1978. Also in January, activities at the Philadelphia station increased, and Cohen ordered office furniture for Aeronautics' office there. Further, Brownstein renewed his efforts to switch ABC's Houston and Kansas City stations to Aeronautics. He failed to persuade the station managers in these two cities to leave ABC.

Diane Virzi, a customer service manager in ABC's Chicago office, who initially intended to leave with Brownstein and the others, decided to remain with ABC. She related this to Brownstein on January 23, 1978. Thereafter, Agnes telephoned her and cautioned her not to say anything about Aeronautics because to do so could hurt her friends.

On January 25, 1978, approximately one month after leaving ABC,

Agnes purchased all the stock of Fifty States Freight Corp. from his friend, Mildred Zenlea, and thus became the owner of Aeronautics.

OPINION

Plaintiff ABC contends that (1) the trial court erred in refusing to enjoin defendants for two years from doing business with the 52 principal customers of plaintiff; (2) the trial court erred in its determination that defendant Weiss is not liable to plaintiff; and (3) the amount of damages awarded by the trial court is against the manifest weight of evidence. In addition, defendants-cross-appellants raise several points in their appeal from the judgment against them on the issue of their liability to plaintiff. We conclude that all defendants except Weiss are liable to ABC but that injunctive relief at this state is inappropriate. We also affirm the award of damages, with modification.

I.

All defendants except Weiss appeal from the judgment of their liability to ABC. Their major thesis is that the mass walkout of January 31, 1978, is not an actionable breach of fiduciary duty. They also assert that the plaintiff failed to establish defendants' participation in the conspiracy against it.

■■■ Initially, it should be noted that the fact that none of the defendants (except for Agnes) had employment contracts is immaterial to plaintiff's tort action. Defendants argue that because their employment status was terminable at will, their collective departure is not actionable. In our *1978 ABC Opinion*, we recognized that the pecuniary interests involved in conducting a business are as much entitled to protection as the right to guard property already acquired. (*1978 ABC Opinion*, 62 Ill. App. 3d 671, 683, 379 N.E.2d 1228, 1236.) The malicious inducement of an employee to terminate an existing employment to enter the employment of another gives rise to a cause of action and " 'the fact that the contract of employment is terminable at will does not bar recovery.' " (62 Ill. App. 3d 671, 683, 379 N.E.2d 1228, 1237.) We further noted that one under a fiduciary duty breaches the fiduciary trust if he solicits his employer's customers, appropriates his employer's personalty, or entices co-workers away from his employer. We also stated that it is not necessarily a breach of duty for an agent to set up a rival business while working for his principal, although it would be a breach if the agent *continued* working for his principal after the rival corporation began doing business in competition with his principal. (*1978 ABC Opinion*, citing *James C. Wilborn & Sons, Inc. v. Heniff* (1968), 95 Ill. App. 2d 155, 237 N.E.2d 781.) Thus the agent must terminate his employment with his employer before actively participating in the rival concern. We reaffirm these

principles as correct statements of Illinois law, applicable to the issue of defendants' liability.[1]

## A.

There is ample evidence in the record to support the judgment of liability. Defendants were key management employees of ABC who were actively promoting the interests of Aeronautics while still employed by ABC. The injury to ABC was the sudden, potentially crippling loss of half of its business and major customers, as well as substantial numbers of its personnel. The cause of this injury was defendants' well-organized plan and their conduct in furtherance of the plan before they departed from ABC. The trial court found that the actionable conspiracy began when Agnes resigned—September 30, 1977—and lasted until February 1, 1978.

Although the individual defendants testified that they had no knowledge of Aeronautics until January 30, 1978, when Agnes offered them employment with Aeronautics, the trial court's judgment clearly indicates that this was controverted by plaintiff's evidence. Many of ABC's witnesses testified regarding conversations with one or more of the defendants in which Aeronautics was discussed. On the other hand, some former customers of ABC testified that they were not contacted by Aeronautics until after the walkout. In weighing the evidence and judging credibility, the trial court found that defendants' evidence was outweighed by that of plaintiff.

■■ Defendants also challenge the admissibility of certain evidence—most importantly, the testimony of defendant Brownstein and Barbara Crane. We uphold the trial court's admission of the testimony. The statements of Brownstein are admissions of a party co-conspirator. After the court found that a conspiracy had been established, it properly admitted these statements against all the other co-conspirators. (*People v. Barkas* (1912), 255 Ill. 516, 522, 99 N.E.2d 698, 702; *Marcus v. Ratsky* (1916), 198 Ill. App. 496, 498.) Although Barbara Crane was not joined as a party defendant, she was, in effect, a co-conspirator during the time and events to which she testified at the hearings. Her testimony, largely based on her discussion with Brownstein, was properly considered by the trial court also, because of her role in the plan. Moreover, independent evidence corroborated the testimony of Brownstein and Crane. For

---

[1] The parties have briefed the issue of whether the *1978 ABC Opinion* controls the instant appeal under the "law of the case" doctrine. We note that the holding of the 1978 opinion only involved the propriety of the application for a preliminary injunction, based solely on plaintiff's case-in-chief. The record before us on the instant appeal contains the defendants' evidence as well as plaintiff's rebuttal, all of which was evaluated as an adjudication of the merits. Therefore, strict application of the law of the case doctrine is not appropriate. General principles of law stated in the 1978 opinion, of course, remain effective.

example, Larry Lindell and Bernie Glazer, ABC's Los Angeles cartage agents, and several ABC employees and customers testified regarding their involvement in or knowledge of defendants' plans. We therefore uphold the trial court's judgment against the defendants, based upon the weight of the evidence.

## B.

Defendants challenge their adverse judgment on yet another ground. They assert that certain of the trial court's specific oral findings are inconsistent with the general finding of defendants' liability. They argue that the specific findings negate one or more of the elements of a conspiracy. Paraphrasing the trial court's specific findings in its oral ruling of June 7, 1979, the defendants state that the "allegedly illegal acts constituting the conspiracy in this case [are] leaving ABC's employment on a fixed date, taking with them other employees, and going immediately into competition with ABC. If these acts were not illegal, then the finding of a conspiracy, which depends upon it, is erroneous as a matter of law." Defendants base this argument on two of the trial court's "findings": (1) that defendants were motivated by their loyalty to Agnes rather than their intention to destroy ABC; and (2) that customers left ABC for Aeronautics because of their personal relationships with defendants rather than presolicitation or misrepresentation on the part of the defendants.

■■ We reject this theory also. The finding that defendants' motives were grounded in loyalty to Agnes does not affect their liability. The essence of a conspiracy is the combination of two or more persons to accomplish an illegal object or to accomplish a legal object by illegal means. (*Bimba Manufacturing Co. v. Starz Cylinder Co.* (1969), 119 Ill. App. 2d 251, 256 N.E.2d 357.) In this case, the actionable conduct was defendants' intentional or conscious plan to act, in concert, in such a way as to breach a duty and injure their employer, ABC. Actual "malice" or ill-will is unnecessary. (See *Doremus v. Hennessy* (1895), 62 Ill. App. 391, 406, *aff'd* (1898), 176 Ill. 608, 52 N.E. 924.) Hence, defendants' motives do not excuse their liability.

The other "finding" that defendants challenge is the trial court's supposed conclusion that defendants did not actually solicit ABC's customers before defendants left ABC. The court stated that "[t]he customers and issues [*sic*] did not leave ABC *because of* presolicitation or misrepresentation of the defendants. They clearly left because of their personal relationship with the defendants." (Emphasis added.) In the hearing on damages the court stated that the "thrust" of defendants' behavior was not pre-termination diversion of plaintiff's business. Appar-

ently, defendants would elevate these comments to grounds for reversal, on the basis that such a finding is irreconcilable with the judgment itself. We disagree.

Undoubtedly, the presence or absence of pre-termination solicitation often is significant in Illinois cases that involve employees who compete with their employers. As we noted in our *1978 ABC Opinion*, 62 Ill. App. 3d 671, 683, 379 N.E.2d 1228, 1237, an employee who merely prepares to form a rival company might not be in breach of his duty, whereas an employee who continues to work for his employer after the rival company began operating would be in breach. By implication, the finding that an employee actively recruited his employer's customers while working for him certainly would strengthen a determination of that employee's liability to his employer. Conversely, the lack of evidence of customer solicitation would be but one factor to consider in determining whether a particular defendant breached a fiduciary duty to his employer. As the evidence in this case indicates, defendants' actionable conduct included their enticement of ABC personnel to leave ABC with them.

Authorities cited by both sides indicate that grounds for relief may be based on a defendant's pre-termination solicitation of his employer's customers, appropriation of trade secrets, or breach of reasonable restrictive covenants not to compete. (See, *e.g.*, *Wolf & Co. v. Waldron* (1977), 51 Ill. App. 3d 239, 366 N.E.2d 603 (plaintiff entitled to preliminary injunction to enforce restrictive covenant in employment contract); *Armour & Co. v. United American Food Processors, Inc.* (1976), 37 Ill. App. 3d 132, 345 N.E.2d 795 (preliminary injunction should have issued enjoining plaintiff's employees from using confidential customer lists obtained during employment with plaintiff); *Ellis & Marshall Associates, Inc. v. Marshall* (1974), 16 Ill. App. 3d 398, 306 N.E.2d 712 (absent a covenant not to compete, fraud, taking of customer lists or trade secrets, defendant's conduct *after* his resignation is not enjoinable): *cf. James C. Wilborn & Sons, Inc. v. Heniff* (1968), 95 Ill. App. 2d 155; 237 N.E.2d 781 (salesman for plaintiff manufacturer did not violate duty to plaintiff by forming rival business and buying machinery for it while employed by plaintiff, where salesman immediately left plaintiff's employ upon commencement of rival concern's business).

Contrary to defendants' assertion, cases such as *Wilborn* and *Ellis* do not preclude this court's affirmance of the trial court's judgment, although the court in those cases found that no actionable pre-termination solicitation had occurred. In both *Wilborn* and *Ellis*, this court affirmed the trial courts' judgments denying injunctive relief as not being against the manifest weight of the evidence. Neither case involved evidence that

clearly established an actionable plan or conspiracy, in contrast to the facts of the instant case. In *Ellis*, the court found that defendant had made statements to a few of plaintiff's customers and employees that were merely indicative of defendant's "future plans," rather than actual solicitations that they leave plaintiff to work for defendant. The court found it "unfair to characterize the defendant's conversations [with 2 of plaintiff's employees] as attempts to entice away or pirate the plaintiff's employees." (16 Ill. App. 3d 398, 402, 306 N.E.2d 712, 716.) After stating that the record showed that defendant merely "informed" others of his plans and did not "pre-sell" any clients on his plan to leave plaintiff, the court concluded that "[i]n the instant case there was no demonstrable business activity on the part of the defendant or his newly formed corporation until March 9, 1973, a date even the plaintiffs admit was the defendant's last date of employment with the plaintiff's corporation." 16 Ill. App. 3d 398, 403, 306 N.E.2d 712, 716.

Defendants' reliance on *Ellis* and other similar cases is misplaced because the record before us contains the testimony of numerous witnesses, as well as many exhibits, which support the judgment of liability. The parties' authorities, thus, mainly demonstrate the importance of the specific facts of employment cases involving unfair competition or breach of fiduciary duty.

■■ We further note that defendants' position regarding the pre-termination solicitation issue rests on a faulty interpretation of the trial judge's comments. The trial judge did not explicitly state that there was no evidence of pretermination solicitation. Instead, he indicated that solicitation was not the sole motivating force behind the defection of ABC's clients and personnel. It is undeniable that defendants, at the very least, "advised" customers of their future intentions. Whether some of the evidence is characterized as "pretermination solicitation" of customers or "advice of future plans," it supports the general judgment of liability, especially in view of all the other circumstances of this case. A review of the record reveals that the *effect* of these "discussions" or "solicitations" contributed to the success of defendants' walkout plan. We find especially persuasive of liability the uncontested fact that a large number of ABC's customers and personnel switched to Aeronautics simultaneously. Certainly, this could not have occurred absent defendants' prior careful planning. In view of the above, we find defendants' second major argument for reversal untenable also.

## II.

We next consider whether the trial court's judgment in favor of attorney Franklin Weiss is against the manifest weight of the evidence. We find that it is not.

## A.

ABC charges that Weiss' activities on behalf of Aeronautics, at a time when Weiss was ABC's outside counsel, bring him within the conspiracy of the other defendants. Alternatively, ABC alleges that Weiss has breached his fiduciary duty to ABC by simultaneously serving two masters having conflicting interests. At the very least, plaintiff urges, Weiss owed ABC full disclosure of his involvement with Aeronautics.[2]

Testimony concerning Weiss in the 1978 and 1979 hearings adduced the following: Weiss was ABC's attorney from approximately 1970 through January of 1978. In 1975, Weiss negotiated the purchase of Aeronautics by Mildred and Perry Zenlea through their newly formed Fifty States Freight Corporation. The Zenleas are friends of defendant Agnes, who acquired ownership of Aeronautics on January 25, 1978, through his wholly owned corporation, Able Air Freight Co.

On July 20, 1977, Aeronautics' operating authority was revoked by the Civil Aeronautics Board. Weiss, acting as counsel for Aeronautics, effectuated the subsequent reinstatement of Aeronautics' operating authority. At that time he signed a form as Aeronautics' "Assistant Secretary." Other testimony indicates that Weiss provided Agnes with legal advice regarding the Aeronautics venture; that Weiss allowed Aeronautics to use his New York office address as at least one of its offices, and that he ordered air bills for Aeronautics' use. Plaintiff's exhibits further show that Aeronautics' bank statements from Banco de Popular were mailed to Weiss' address and that Weiss, on several occasions, wrote letters to Banco following Agnes' purchase of Aeronautics, requesting that the bank discontinue mailing the statements to his New York office.

Based on the above, ABC argues that Weiss had sufficient knowledge of and agreement to the other defendants' conspiracy that he is liable as a co-conspirator and that, by secretly representing plaintiff's competitor, he breached his fiduciary duty to ABC. The trial court found that there was not sufficient evidence to hold him liable as a co-conspirator. Because we affirm that judgment, it is not necessary to address all of the points presented in Weiss' brief to support the trial court's ruling.

A conspiracy is an agreement or combination of two or more people to do an unlawful act or to do a lawful act by unlawful means. (*E.g., Bau v. Sobut* (1977), 50 Ill. App. 3d 732, 365 N.E.2d 724; *Bimba Manufacturing Co. v. Starz Cylinder Co.* (1970), 119 Ill. App. 2d 251, 256 N.E.2d 357.)

---

[2] Weiss, a New York lawyer, never appeared in person before the Illinois court. His attorney entered a special and limited appearance to contest the court's jurisdiction over him. The trial court denied his motion to quash and the jurisdictional issue was not raised on this appeal. Weiss' attorney represented his interests following the court's denial of the motion to quash, and participated in closing arguments. Defendant Weiss' initial objection to the admissibility of all the evidence against him is without merit because he stipulated, along with the other defendants, that evidence in the record would be admitted for all purposes in adjudicating plaintiff's complaint.

The plaintiff's burden is to establish, by clear and convincing evidence, an individual's participation in the conspiracy. (*Illinois Rockford Corp. v. Kulp* (1967), 88 Ill. App. 2d 458, 232 N.E.2d 190, *rev'd on other grounds* (1968), 41 Ill. 2d 215, 242 N.E.2d 228; *Sears v. Weissman* (1972), 6 Ill. App. 3d 827, 286 N.E.2d 777.) Once established, the acts and declarations of one co-conspirator are admissible against all conspirators whose participation therein has been proved. (*Alm v. General Telephone Co.* (1975), 27 Ill. App. 3d 876, 327 N.E.2d 523.) Such proof can be circumstantial.

■■ The weight of the evidence against Weiss was for the trier of fact to evaluate, and the findings must be sustained unless wholly unsupported by the evidence. (*Witvoet v. Quinlan* (1976), 41 Ill. App. 3d 724, 354 N.E.2d 524.) It has been stated that if the circumstances relied upon are as consistent with innocent conduct as with guilt, the court's duty is to find that the conspiracy has not been proved. (*Bimba*, 119 Ill. App. 2d 251, 267, 256 N.E.2d 357, 365, citing *Fuller v. Garber* (1938), 296 Ill. App. 389, 16 N.E.2d 251.) We find no reason to believe that the trial court's inferences from all the evidence before it were unreasonable. In its oral ruling the trial court noted that, "Since I can draw either a good inference or bad inference from these various acts, I choose to draw the good inference in that he acted properly as an attorney." It is not the role of the appellate court to substitute its judgment for that of the trier of fact, and we therefore affirm the court ruling on this basis.

B.

The second related basis of liability the plaintiff asserts is that Weiss breached his attorney-client fiduciary duty to ABC by secretly representing Aeronautics' adverse interests. This issue involves the somewhat nebulous standards of professional responsibility embodied in codes of ethics.[3] It is undisputed that Weiss acted as Aeronautics' counsel during the time when he was also retained by ABC. Nor is it arguable that the two firms, as direct competitors, have adverse interests. Weiss, however, characterizes his dual representation as constituting "competing" rather than "conflicting" interests and declares that there is no legal prohibition against an attorney's performance of legal services for more than one company in a single industry.

---

[3] For example, the A.B.A. Code of Professional Responsibility Disciplinary Rule 5—105(B) provides in relevant part that "[a] lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, or if it would be likely to involve him in representing differing interests." DR 5-105(C) permits such multiple representation if each client consents to the representation after the attorney's full disclosure of the possible consequences.

■■ ■ We note that there are few cases that directly deal with this particular issue. Necessarily, the facts of each case will determine whether an individual attorney's representation of two companies in the same industry is an actionable breach of duty. The law recognizes that the attorney-client relationship is fiduciary in nature (*McFail v. Braden* (1960), 19 Ill. 2d 108, 166 N.E.2d 46; *Illinois Tool Works Inc. v. Kovac* (1976), 43 Ill. App. 3d 789, 357 N.E.2d 639), and that an attorney for a corporate client owes his duty to the corporate entity rather than a particular officer, director, or shareholder.[4] (See *Phillips Construction Co. v. Muscarello* (1976), 42 Ill. App. 3d 151, 355 N.E.2d 567; *In re Banks* (1978), 283 Or. 459, 464, 584 P.2d 284, 287.) Clearly, that Agnes as president of ABC engaged Weiss' services in connection with Aeronautics does not excuse Weiss' duty to the corporate entity of ABC, notwithstanding his prior dealings with Agnes as the head of ABC. Weiss' implication to the contrary is disapproved.

In considering Weiss' relationship with Agnes, the trial judge stated:
> "When I was in practice, I dealt with a lot of corporate clients, and my own experience—the president of the corporation would tell me to do something, I would do it. I would say, 'Okay, this is what you want me to do, you are paying me, and I will do it.' I would never, in my wildest imagination, unless something really jumped up and hit me in the face, think that this was some ultra vires act that was in competition with the corporation, unless I was part of it. But there wasn't that kind of evidence in this case."

Despite the judge's comments regarding his personal experiences, his conclusion was clearly based on the insufficient evidence of Weiss' knowledge of and participation in the conspiracy. Having determined that Weiss was not aware of defendants' tortious plan, the court went on to find that Weiss' acts were capable of the "good inference" that he was merely acting within the scope of his professional duties, according to his professional judgment.

■■ We cannot say that the court's judgment that Weiss did not breach a fiduciary duty to ABC is against the manifest weight of the evidence. Plaintiff did not introduce expert testimony to establish the standard of care applicable to Weiss' decision to represent Aeronautics while in the employment of ABC. Unless the conflict is so clear as to be undisputed, expert testimony is generally necessary to prove lawyer malpractice. (See

---

[4] The A.B.A. Code of Professional Responsibility, Ethical Consideration 5-18 provides in pertinent part that "[a] lawyer employed or retained by a corporation ° ° ° owes his allegiance to the entity and not to a stockholder, director, officer, employee, representative, or other person connected with the entity. In advising the entity, a lawyer should keep paramount its interests and his professional judgment should not be influenced by the personal desires of any person or organization ° ° °."

*Schmidt v. Hinshaw, Culbertson, Moelmann, Hoban & Fuller* (1979), 75 Ill. App. 3d 516, 394 N.E.2d 559.) To be sure, it would have been preferable had Weiss avoided all appearance of impropriety by disclosing his representation of Aeronautics to ABC or by declining to represent Aeronautics altogether. On the record before us, however, we cannot say that either intentional or negligent misconduct has been proved. Because we are not faced with the issue, we express no opinion whether Weiss' conduct might amount to a breach of an applicable professional code of responsibility. We therefore affirm the trial court's judgment on this issue.

## III.

Plaintiff has established its right to relief from all defendants except Weiss. The remaining issues concern the type and scope of relief to which plaintiff is entitled.

## A.

ABC's major thesis is that defendants' illegal interference with its customers and employees constitutes continuing and irreparable harm. Regardless of ABC's current profit picture,[5] it is contended, its injury continues until defendants are enjoined from dealing with ABC's former customers. Only then will ABC be able to recapture its lost customers. Legal relief is inadequate because of the ongoing nature of the injury and because of the difficulty involved in calculating damages. Thus, plaintiff argues, injunctive relief coupled with ascertainable damages is necessary to make plaintiff whole. We reject these contentions.

■■ As plaintiff points out, it is true that in our 1978 interlocutory opinion we held that ABC had established a *prima facie* case for preliminary injunctive relief. However, the posture of this case—two years later—has changed significantly. As noted earlier, this is an appeal from a full trial on the merits, whereas the prior appeal involved only plaintiff's case-in-chief. Defendants' evidence and plaintiff's rebuttal comprises hundreds of pages of additional transcript. Moreover, plaintiff's contention that injunctive relief is required "as a matter of law" because it prevailed on the merits ignores the discretionary nature of equitable relief; there is no absolute right to an injunction.

■■ Nor do we believe that the trial court abused its discretion in denying the permanent injunction. ABC mistakenly relies on our 1978 holding that the trial court abused its discretion in denying *preliminary* injunctive relief based on the evidence before it at that time. We noted that a preliminary injunction could properly issue (even if the effect

---

[5] ABC recovered from its financial setback and began to show a small profit by the end of 1978.

would be to put Aeronautics out of business) as long as ABC made a sufficient showing of irreparable harm to a legitimate interest, the inadequacy of legal relief, and the likelihood of prevailing on the merits. (*1978 ABC Opinion*, 62 Ill. App. 3d 671, 682, 379 N.E.2d 1228, 1239.) The fact that plaintiff ultimately prevailed in this case, however, does not require the automatic issuance of a permanent injunction, as plaintiff contends. That this is so may be readily understood when the distinction between temporary and permanent injunctions is borne in mind. On a petition for a preliminary injunction, the court is concerned with maintaining the status quo between the parties until a full hearing on the merits can be held. (*E.g., Armour & Co. v. United American Food Processors, Inc.* (1976), 37 Ill. App. 3d 132, 345 N.E.2d 795; *Wolf & Co. v. Waldron* (1977), 51 Ill. App. 3d 239, 366 N.E.2d 603.) The grant or denial of temporary injunctive relief, of course, is based on the circumstances at the time relief is requested.

A permanent injunction, on the other hand, generally extends, maintains, or restores the status quo indefinitely or for a limited time. Thus, in the usual case, where the defendant is already subject to a preliminary injunction and the plaintiff prevails on the merits, the preliminary injunction is properly made permanent. In contrast, in this case the parties' positions were not frozen in time through a preliminary injunction. Absent the element of continuing, irreparable harm at *this* time, the granting of a permanent injunction would greatly disrupt Aeronautics' ongoing business while not substantially benefiting plaintiff, who concededly is currently profitable. Thus, the *restorative* purpose of injunctive relief would not be effectuated.

ABC's authorities which uphold the granting of preliminary injunctive relief do not compel a different result. None of the cited cases involved the specific issue before this court. Typically, the cases cited upheld the lower court's discretionary grant of preliminary injunctive relief to enforce a restrictive covenant or other contractual provision. (*E.g., Sports Unlimited, Inc. v. Scotch & Sirloin of Woodfield, Inc.* (1978), 58 Ill. App. 3d 579, 374 N.E.2d 916; *Wolf & Co. v. Waldron* (1977), 51 Ill. App. 3d 239, 366 N.E.2d 603; *Armour & Co. v. United American Food Processors, Inc.* (1976), 37 Ill. App. 3d 132, 345 N.E.2d 795.) Clearly, these cases do not mandate reversal of the trial court's order in the instant case.

It should be emphasized that the fortuity of ABC's survival and current profitability does not excuse defendants' wrongful conduct. It is a factor to consider, however, in determining whether the prerequisites for injunctive relief exist at this time. We find that the element of irreparable injury is no longer present in any real sense. Plaintiff's injuries can be

compensated adequately in damages. Therefore, we affirm the trial court's refusal to permanently enjoin defendants from doing business with plaintiff's former customers.

### B.

The final issue before this court concerns the trial court's award of damages. The judgment of $138,535.60 plus $13,675.40 in costs is comprised of two components: (1) ABC's lost profits for the one month period following the walkout ($87,000) and (2) one-third of the compensation ABC paid to the individual defendants during the period of the conspiracy, from September 30, 1977, to February 1, 1978 ($51,535.60).

ABC protests that this amount is manifestly inadequate under the evidence and the law. According to ABC's calculations, it should receive a total of $3,059,709 in compensatory damages and $2,000,000 in punitive damages. After carefully reviewing the record and the applicable law, however, we find that the lower court's award, with the exception of the defendants' salary forfeitures, was within the bounds of its discretion.

### Lost Profits

■■ Lost profits in a tort action are limited to those damages proximately caused by defendants' wrongful conduct. (See *Horan v. Klein's-Sheridan, Inc.* (1965), 62 Ill. App. 2d 455, 459, 211 N.E.2d 116.) It is generally stated that a plaintiff must present competent proof of damages from which a reasonable basis of computation can be derived. (*Schatz v. Abbott Laboratories, Inc.* (1972), 51 Ill. 2d 143, 148, 281 N.E.2d 323, 326.) In the instant case, plaintiff presented data and expert testimony which projected the profits ABC would have enjoyed in 1978, 1979, and 1980 if the walkout and subsequent loss of business had not occurred. The parties stipulated that at least $6,000,000 of Aeronautics' 1978 revenues were derived from business with ABC's former customers. Using the stipulated figure as a basis for ABC's lost revenues and considering ABC's past profitability, plaintiff's chief executive officer calculated that ABC's 1978 profit should have been $1,040,000. Instead, plaintiff sustained an operating loss of $864,883. Adding these figures together, ABC claims 1978 losses of $1,904,883. Plaintiff also called Claire Hansen, a chartered financial analyst, to project its 1979 and 1980 lost profits. Using a statistical technique known as the linear regression method, he calculated these losses to be $519,000.

While the plaintiff's economic evidence and theories demonstrate commendable preparation on the part of counsel, the trial court was not impelled to adopt the estimates of plaintiff's expert witnesses. (See *Hamilton v. American Gage & Machine Corp.* (1976), 35 Ill. App. 3d 845, 342 N.E.2d 758.) We therefore must affirm the award unless it is against

the manifest weight of the evidence. *Schatz v. Abbott Laboratories, Inc.* (1972), 51 Ill. 2d 143, 281 N.E.2d 323.

We find that, despite a certain neatness of accounting logic, plaintiff's expert opinion testimony does not compel a reversal of the trial court's award. Defendants' witnesses challenged ABC's operating loss figure, as well as certain assumptions upon which ABC's witnesses based their lost profit projections. At the close of the damages hearing the court determined that the "impact of the activation" of defendants' tortious plan—that is, the harm resulting from the collective walkout—could reasonably be calculated to last for 30 days. Using ABC's total 1977 profits, the court divided that number by 12 to yield $87,000 as an average monthly profit figure. The court reasoned that defendants unfairly attained a competitive edge which lasted only for a short while because of the "peculiar nature of the industry and the particular facts of this case."

Regarding the nature of the air freight industry, we note that it is not uncommon for customers to follow sales personnel from employer to employer. Defendants were not subject to restrictive covenants and thus they could have followed Agnes without incurring liability, had they done so without conspiring to leave collectively, while taking ABC personnel and customers. Of course, the fact that they might have accomplished legally what they did illegally does not in any way lessen their liability. Yet, this observation highlights one of the variables that the trial court considered in assessing what damages were attributable to defendants' misconduct. ABC's estimated lost profits were derived from accounting methods that necessarily assume, as "fact," certain unprovable possibilities. For example, ABC's lost profit figures were based on the assumption that, absent defendants' misconduct, all defendants except Agnes would have remained indefinitely at ABC rather than leave to join Agnes. This in turn implies that the customers doing business with ABC before the walkout would have remained with ABC, along with the stipulated $6,000,000 of Aeronautics' 1978 revenues. The validity of this assumption was weakened by the trial court's finding that the defendants left ABC primarily out of loyalty to Agnes, who had hired them initially. Hence, defendants probably would have left shortly after Agnes did.

■■ The foregoing discussion illustrates the problem of determining the extent of plaintiff's compensable losses. Plaintiff's economic theory provides one viable way of calculating these losses, yet defendants challenged certain underlying assumptions of that calculation. That the court might have accepted plaintiff's position is certainly a different assertion than that it was compelled to do so. Economic data can be interpreted in different ways for different purposes. As useful as a particular accounting technique may be in predicting a company's financial future, it cannot be regarded as conclusive proof of legal

damages; the judge or jury must be free to draw their own inferences from the evidence presented. See *Landolt v. Stratmann* (1967), 87 Ill. App. 2d 81, 230 N.E.2d 498 (abstract); 1 Gard, Illinois Evidence Manual 316 (2d ed. 1979).

■■ Because of the above considerations, we cannot say that the trial court's measure of damages was erroneous as a matter of law, or that the court ignored the evidence. Moreover, were we to ignore the established principle that a reviewing court must not substitute its judgment for that of the trial court, we could not be certain that our determination would prove superior. Whether ABC's lost profits award is based on a period of one month, six months, or three years, a line must be drawn at some point; it is the factfinder's role to draw it.

*Salary Forfeiture*

ABC also challenges the adequacy of the second element in the damages award, ABC's recovery of one-third of the compensation it paid to defendants during the period of their breach of duties. This raises the question of whether those who breach their fiduciary duties are required to forfeit all compensation received during the period of breach, or whether the trial court may apportion this compensation in recognition of services "properly" rendered. We believe that, under the policy of this State, plaintiff is entitled to the total compensation it paid the individual defendants during the period from September 30, 1977, to February 1, 1978.

■■ After scrutinizing Illinois law relevant to this inquiry, we find that the apportionment concept was misapplied in this instance. Initially, both parties dispute the interpretation to be given to the Restatement (Second) of Agency §456 (1958), which embodies the compensation rights of a contracting party who is in default. The section provides:

"If a principal properly discharges an agent for breach of contract, or the agent wrongfully renounces the employment, the principal is subject to liability to pay to the agent, with a deduction for the loss caused the principal by the breach of contract:

(a) the agreed compensation for services properly rendered for which the compensation is apportioned in the contract, whether or not the agent's breach is wilful and deliberate; and

(b) the value, not exceeding the agreed ratable compensation, of services properly rendered for which the compensation is not apportioned if, but only if, the agent's breach is not wilful and deliberate."

In simpler terms, an agent is entitled to payment for all work properly rendered during specific pay periods or for specific items of work "even

if, because of unfaithfulness or insubordination, the agent forfeits his compensation for subsequent periods or items." (Restatement (Second) of Agency §456, Comment (b)(1958).) However, the wilfulness of the agent's breach operates to deny him any compensation that cannot be apportioned. (See Restatement (Second) of Agency §456, Comment (c)(1958).) Defendants urge, and apparently the trial court assumed, that because the individual defendants continued to perform some services for ABC during the period of the conspiracy, they were entitled to partial compensation. In support of this contention defendants quote from *Lydia E. Pinkham Medicine Co. v. Gove* (1939), 303 Mass. 1, 4, 20 N.E.2d 482, 486:

> "[T]he American Law Institute finds the basis for refusal of compensation to a trustee, not in the theory of a penalty, but in the theory that payment is not due for services not properly performed * * *. Apparently upon similar reasoning, a disloyal agent may have compensation which is 'apportioned' by the contract of employment to services properly performed."

We believe that this interpretation of apportionment is valid in its recognition that contractual remedies are not punitive in nature and that where a contract is severable, full and proper performance of apportionable parts should be compensated. Consistent with this, the individual defendants properly retained their compensation for all periods until the actual commencement of the conspiracy.

■■ Yet, we cannot extend the apportionment concept to justify the trial court's decision that defendants should forfeit only one-third of compensation paid to them during the four month period of their breach of duties. Under the law of this State it has long been recognized that "an agent is entitled to compensation only on a due and faithful performance of all his duties to his principal." (1 Ill. L. & Prac. *Agency* §93 (1953), citing, *e.g.*, *Steinmetz v. Kern* (1941), 375 Ill. 616, 32 N.E.2d 151.) In applying this rule "it makes no difference whether the result of the agent's conduct is injurious to the principal or not, as the misconduct of the agent affects the contract from considerations of *public policy* rather than of injury to the principal." (Emphasis added.) (*Steinmetz v. Kern* (1941), 375 Ill. 616, 621, 32 N.E.2d 151, 154; see *Dorin v. Occidental Life Insurance Co.* (1971), 132 Ill. App. 2d 387, 270 N.E.2d 515.) More recently, the Illinois Supreme Court reaffirmed the appropriateness of salary forfeiture as an element of damages that is distinct from lost profits. In *Vendo Co. v. Stoner* (1974), 58 Ill. 2d 289, 321 N.E.2d 1, the plaintiff corporation's former employee and officer violated his fiduciary duties in addition to breaching restrictive covenants in his employment contract. Defendant's wrongdoing was to invest in the development of a vending machine that

was ultimately used in competition with his employer. In essence, the court treated the breach of fiduciary duty as a usurpation of plaintiff's opportunity to develop and sell the new vending machine, which resulted in damages for lost profits, diminution in the value of plaintiff's business, and the forfeiture of defendant's salary for almost 3½ years. The salary forfeiture was limited to the period during which the court found that he breached his fiduciary duties. (*Vendo*, 58 Ill. 2d 289, 314, 321 N.E.2d 1, 14.) In response to defendant's contention that the lost profits award coupled with the salary forfeiture constituted double recovery, the court stated that "[t]he judgment against Stoner did not represent a forfeiture of his total salary but only for the period of time beginning with the breach of his duty of loyalty * * *. It borders upon the frivolous for defendants to claim a right to retain the compensation which the judgment restored to plaintiff." (58 Ill. 2d 289, 314, 321 N.E.2d 1, 14.) We believe that the *Vendo* decision implicitly supports ABC's position on this issue. The confusion over "total" versus "partial" salary forfeiture, as expressed in the apportionment principle, is eliminated by the recognition that within the actual period of tortious conduct, salary forfeiture is required because the agent's services are not being "properly" performed. The agent retains compensation rightfully earned before the breach, for specific periods. As a matter of public policy as expressed in the above cases, however, one who breaches fiduciary duties has no entitlement to compensation during a wilful or deliberate course of conduct adverse to the principal's interests.

We hold that, under the circumstances of this case, defendants forfeited their right to all compensation paid them during the period from September 30, 1977, to February 1, 1978. Because we can easily calculate the increased amount of this element of damages, it is unnecessary to remand the cause to the lower court. For each defendant, the record contains specific salary figures computed by the lower court in amounts of one-third of their total salaries for the four-month period.[6]

The tripling of these figures, set forth below, yields the proper

---

[6] In the June 7, 1979, oral ruling on damages, the judge stated:

"I find against Agnes in the amount of $18,026.17; Brownstein, in the amount of $7,346.17; Cohen, in the amount of $4,259.67; Eades, in the amount of $8,590.92; Krause, in the amount of $7,134.67; Marco, in the amount of $6,178." We modify the above amounts as follows:

| | | |
|---|---|---|
| Agnes | $18,026.17 X 3 = | 54,078.51 |
| Brownstein | 7,346.17 X 3 = | 22,038.51 |
| Cohen | 4,259.67 X 3 = | 12,779.01 |
| Eades | 8,590.92 X 3 = | 25,772.76 |
| Krause | 7,134.67 X 3 = | 21,404.01 |
| Marco | 6,178.00 X 3 = | 18,534.00 |
| | $51,535.60 | $154,606.80 |

amount of the forfeited salary. Pursuant to Supreme Court Rule 366,[7] we therefore modify the lower court's award on this element of damages, from $51,535.60 to $154,606.80.

*Punitive Damages*

■■ Plaintiff's final contention is that it is entitled to punitive damages of $2,000,000. Although such damages may be awarded in intentional tort cases, to do so is solely discretionary with the trial court. (*Smith v. Johnston* (1979), 73 Ill. App. 3d 601, 391 N.E.2d 1092; *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353.) We know of no cases which have held that the denial of punitive damages was an abuse of discretion. On the contrary, it has been stated that punitive damages are not favored in the law (*First National Bank v. Amco Engineering Co.* (1975), 32 Ill. App. 3d 451, 335 N.E.2d 591) and should be confined within narrow limits. (*Thomas v. Rossetter* (1950), 339 Ill. App. 647, 91 N.E.2d 155 (abstract).) Based on the record before us we conclude that the trial court did not abuse its discretion in denying punitive damages.

In sum, ABC is entitled to $87,000 compensatory damages for its lost profits, $154,606.80 based on defendants' salaries, and $13,675.40 in costs, for a total of $255,282.20.

For the reasons set forth herein, the judgment of the trial court is affirmed in all respects with the exception of one element of the damages awarded, and modified with respect to that element.

Affirmed in part; modified in part.

SULLIVAN, P. J., and MEJDA, J., concur.

---

[7] Supreme Court Rule 366(a)(5) (Ill. Rev. Stat. 1979, ch. 110A, par. 366(a)(5)) provides:
"In all appeals the reviewing court may, in its discretion, and on such terms as it deems just:

    o o o

(5) give any judgment and make any order that ought to have been given or made, and make any other and further orders and grant any relief o o o that the case may require." See *Farwell Construction Co. v. Ticktin* (1978), 59 Ill. App. 3d 954, 376 N.E.2d 621; *Vallarata v. Lee Optical of Missouri, Inc.* (1973), 12 Ill. App. 3d 112, 298 N.E.2d 212 (where cause is tried by a court sitting without a jury and the parties have had the opportunity to present all their evidence, no useful purpose is served by remanding the matter for a new trial, and the reviewing court will direct entry of the judgment pursuant to Supreme Court Rule 366).